**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Lee W. ROBERTS, also known as Kurlee Roberts, also known as Dr. Lee; Susan Byers; and Jackie Wood, Defendants–Appellants.**

Nos. 92–8065, 92–8066 and 92–8069.

United States Court of Appeals,
Tenth Circuit.

Dec. 17, 1993.

504

Patrick J. Crank, Asst. U.S. Atty. (Richard A. Stacy, U.S. Atty., and David A. Kubichek, Asst. U.S. Atty., Cheyenne, WY, with him on the briefs), Casper, WY, for plaintiff-appellee.

Daniel G. Blythe, Rogers, Blythe & Lewis, Cheyenne, WY, for defendant-appellant Lee W. Roberts.

Corinne A. Miller, Casper, WY, for defendant-appellant Susan Byers.

Ronald G. Pretty, Cheyenne, WY, for defendant-appellant Jackie Wood.

Before MOORE, BARRETT, and GOODWIN,[1] Circuit Judges.

JOHN P. MOORE, Circuit Judge.

This consolidated appeal arises from a multi-state investigation into the illegal distribution of methamphetamine in the Casper, Wyoming area. Of the nine defendants named in a multi-count indictment, three, Lee W. Roberts, Jackie Wood, and Susan Byers, were tried by a jury, convicted, and sentenced to substantial terms of imprisonment. Review of the numerous issues presented requires ferreting out sufficient evidence establishing individual guilt but fails to confirm the many contentions of error defendants have raised. Nevertheless, finding error in the determinations of Mr. Roberts', Ms. Wood's, and Ms. Byers' sentences, we vacate and remand for resentencing consistent with our later discussion.

## I. Background

On March 7, 1990, Karen Flint, a patrolwoman with the Casper Police Department, was dispatched to investigate a report of an armed robbery. Arriving at 1010 West 20th Street, Officer Flint met Lee Roberts[2] and Jackie Wood, who described how someone purporting to have car trouble entered the house asking to use the phone, when a second man armed with a gun burst in. Rob-

---

1. The Honorable Alfred T. Goodwin, Senior Circuit Judge for the United States Court of Appeals for the Ninth Circuit, sitting by designation.

2. Lee Roberts is also referred to as Kurlee Roberts and Dr. Lee throughout the record.

erts stated the intruders stole his overnight bag, which contained $12,000 in cash, and later, Ms. Wood reported a .380 caliber handgun registered to her was also taken. Thus alerted,[3] the following month, Natrona County Deputy Sheriff, Lynette Cohee, working undercover, arranged to buy two eight-balls[4] of methamphetamine from Billy Joe Wood, a friend of Lee Roberts. Officer Cohee paid Billy Joe Wood $580 in pre-reported state buy funds.

A month later, a $100 bill recorded in that buy surfaced in Mesquite, Nevada, after Lee Roberts, riding his motorcycle, was stopped for violating the state helmet law. Impounding the motorcycle because Roberts could not produce proper registration, Nevada patrolmen discovered $23,800 in cash, including the marked $100 bill, in ziplock bags stowed in the saddlebags.

In July 1990, Robert Tanner, a police officer in North Las Vegas, Nevada, working with a confidential informant, met Jackie Wood and Lee Roberts at a North Las Vegas sports bar and purchased 2 ounces of methamphetamine. As the money and drugs were exchanged, Tanner signalled, and police arrested Roberts and Wood.

Finally, on August 18, 1990, Jackie Wood and Lee Roberts were involved in an auto accident in Arizona. Although Roberts offloaded his motorcycle and drove away with Wood, he first discarded a black shaving kit in the desert brush. Retrieved, the bag contained a small pipe and baggies of powdery substance later tested to be methamphetamine.

Subsequent surveillance and authorizations for a pen register and wiretap on Roberts'

Casper telephone wove the intricate web connecting these four events to other players and their roles in what emerged as Lee Roberts' extensive business procuring and distributing methamphetamine in the Casper area. Routinely, for example, it appeared Roberts obtained methamphetamine in Las Vegas, where he owned a trailer home. He then ordered Jackie Wood, who often stayed there, to mail packaged quantities of the drugs to his ex-wife, Carolynn Roberts, in baggies designated for particular sellers, his "customers," in and around Casper. Carolynn Roberts then called Lee's salespeople to pick up their "product." Alternatively, Lee Roberts would drive to Casper and distribute the drugs himself. Most transactions involved eight-ball quantities which were "fronted," that is, sellers received the drugs in advance of payment. Sellers who promptly and regularly paid their bills often received larger, 1 to 2 ounce packages.

In fact, Roberts' Casper employees were like an extended family. Billy Joe Wood, who was involved in the initial Casper buy, is Carolynn Roberts' brother, Lee Roberts' nephew, and Jackie Wood's ex-husband. Jackie Wood and Lee Roberts were lovers. Most sellers were users, and most users strained Roberts' business when they were unable to promptly satisfy their "fronts."[5]

On February 6, 1991,[6] police executed a search warrant on Roberts' Las Vegas trailer, and Kevin Hughes, an agent with the Wyoming Division of Criminal Investigation (DCI) interviewed Roberts, who was then incarcerated in Nevada. At the same time, Jackie Wood, also serving a Nevada sentence for her prior conviction, gave a statement to Wyoming DCI investigator Tony Young. Si-

---

**3.** In the war on drugs, the presence of large amounts of cash and weapons triggers the suspicion of illegal drug activity.

**4.** In methamphetamine parlance, an eight-ball is approximately one-eighth ounce.

**5.** In his February 26, 1991 statement, Roberts complained his customers who became heavy users could only be fronted one-eighth ounce quantities and the combined loss of $20,000 in front balances, the robbery of $12,000 cash, police seizure of $23,800, and his arrests requiring substantial outlays to lawyers and bondsmen made 1990 a very bad year.

**6.** The pen register was authorized on August 20, 1990. The wiretap, authorized to begin on January 9, 1991, was extended once, and ended on February 8, 1991. On January 22, 1991, Cindy Canfield, one of Lee Roberts' confederates, was arrested at the La Quinta Inn in Casper. Police found $1,300 in cash, a powdery substance, and food stamps in her possession. Her arrest sobered Lee Roberts and his confederates and potentially made ongoing surveillance more difficult for the police.

multaneously, in Casper, police executed search warrants on Lee Roberts'.1010 West 20th Street residence and Susan Byers' home.

A subsequent multi-count indictment charged Lee Roberts, Jackie Wood, Billy Joe Wood, Susan Byers, and Carolynn Roberts[7] with conspiracy to possess with intent to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A). Count I catalogued 51 overt acts to achieve the conspiratorial objective. Count II charged Lee Roberts with possession of the handgun stolen in the March 7, 1990 robbery in violation of 18 U.S.C. § 924(c)(1). Count III charged Lee Roberts with possession of two weapons seized in the search of his Nevada trailer in violation of 18 U.S.C. § 924(c)(1). Lee Roberts and Jackie Wood were named in Count IV, aiding and abetting the possession of methamphetamine. In Count V, Susan Byers was charged with using a telephone to facilitate the conspiracy in violation of 21 U.S.C. § 843(b).

Defendants[8] filed numerous pretrial motions of which the Roberts' and Wood's motions to suppress confessions still figure in this appeal as well as their individual motions for a *James* hearing and to suppress wiretaps. The district court denied the various motions to suppress and requested the government submit a written proffer addressing defendants' *James* concerns so that it could evaluate the government's proof of the conspiracy and the nature of the statements prior to trial. Just before the government's opening statement, the district court ruled the prosecution had satisfied the requirements of the *James* hearing by this proffer and found "by a preponderance that the government has evidence, that [ ] establishes the existence of a conspiracy, membership of each of these defendants in that conspiracy

and that certain statements have been made in furtherance of it." The court triaged the prospective coconspirator statements: confessions could not be admitted against codefendants;[9] statements found to be made in furtherance could be admitted against codefendants; and statements in casual conversations could be considered as admissions against interest of the speaker. Given the magnitude of the wiretap—971 calls were intercepted—the court expressed its concern about all of the prospective statements the government might still offer "because the selection process is still going forward," but believed the remedy in each instance would be found in contemporaneous proffers and cautionary instructions.

During trial, the government provided transcripts of and played approximately 27 recorded conversations of varying duration.[10] Interwoven in the daily banter were code words and cues about which government witnesses testified, explaining how the codes translated into deliveries, payments, or visits. DCI agents and Arizona and Nevada investigators involved in the Casper activities and Arizona and Nevada events testified about their particular investigations; codefendants who entered pleas, including Carolynn Roberts and Billy Joe Wood, testified about their involvement and drug use; and other government witnesses who had purchased methamphetamine from Roberts' sellers described the sales and their addictions. The jury found Lee Roberts guilty of conspiracy, aiding and abetting the possession of methamphetamine, and a single § 924(c) violation based on the weapons found in the search of his Nevada trailer. The jury acquitted Roberts of the § 924(c) violation related to the weapon stolen in the March 7, 1990 robbery. Jackie Wood was found guilty of conspiracy

---

**7.** Cindy Canfield, Shawn Baruth, and Robyn Cantrell, also named in the indictment, entered pleas. The grand jury named John Wales as well, but he did not appear and remains a fugitive.

**8.** Midway through trial, defendants Carolynn Roberts and Billy Joe Wood agreed to enter pleas in exchange for their testimony against Lee Roberts, Jackie Wood, and Susan Byers. Therefore, the appellation "defendants" in this consolidated

appeal refers solely to Lee Roberts, Jackie Wood, and Susan Byers.

**9.** Defendants raised, and the court recognized, the potential *Bruton* concerns created by the use of codefendants' confessions, but it believed this disposition as well as limiting instructions allayed the constitutional problems.

**10.** Over defense counsel's objection, at least 1 conversation was replayed for the jury.

and aiding and abetting the possession of methamphetamine. The jury found Susan Byers guilty of conspiracy and using a telephone to facilitate the conspiracy.

After a hearing on his objections to the recommendations in the presentence report (PSR), the district court imposed sentence on Lee Roberts: 330 months' incarceration on Counts I and IV, and 60 months to run consecutively on the Count III § 924(c) violation, to be followed by 10 years of supervised release.[11] Despite her counsel's vigorous objections, the court imposed a 360–month sentence on Jackie Wood on her conspiracy conviction, Count IV aiding and abetting to run concurrently, to be followed by a 5–year term of supervised release. After a hearing on her objections, Susan Byers was sentenced to 121 months' imprisonment, Counts I and V to run concurrently, followed by 5 years of supervised release.

Against this background, defendants raise numerous issues challenging their convictions and sentences. We address defendants' shared arguments at the outset and their individual issues in turn.

## II. Sufficiency of the Evidence of a Single Conspiracy

Although the government may have shown defendants were involved in activities in Wyoming, Nevada, Arizona, or California, defendants Roberts and Wood insist the evidence is insufficient to connect each of these discrete events to the single massive conspiracy alleged. Instead, by conjoining disjunctive events into a single conspiracy, the government, Roberts and Wood urge, created an environment of massive wrongdoing permitting a jury to find guilt by association and not by individual act. Borrowing the *Kotteakos* wheel analogy, 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), that merely because Lee Roberts can be placed at the hub of each of the alleged conspiratorial activities, Roberts and Wood contend the government failed to establish any single rim encircled the disparate activities.

Refining this argument, Ms. Byers details the separate conspiracies: the March 7, 1990 robbery involved only Roberts and Wood; Roberts' Nevada arrest while riding his motorcycle established he possessed drugs and nothing more; the Nevada sports bar buy-bust showed Roberts and Wood sold drugs in North Las Vegas; the Billy Joe Wood sale to Officer Cohee involved drugs bought from another dealer, Seanna Santistevan, who happened to give the marked $100 bill to Roberts; and the Cindy Canfield arrest after she independently set up a sale to a California couple cannot be swept into a single conspiracy simply by placing Lee Roberts at the hub. Ms. Byers contends because she did not know of or participate in the underlying drug culture that fueled all of these activities, the evidence against her, at most, established a buyer-seller relationship in unrelated transactions. This essential fact, she contends, was overwhelmed by ten days of evidence presented predominantly by taped conversations revealing life-styles of drug use and dependence which did not involve her.

The concerns articulated in *Kotteakos* that guilt remain individual and personal and that the "dangers for transference of guilt from one to another across the line separating conspiracies," 328 U.S. at 774, 66 S.Ct. at 1252, predicate our judicial review of the sufficiency of the evidence given the often sweeping scenarios depicted during the prosecution of drug crimes and their attendant, soberingly long sentences. *See, e.g., United States v. Evans,* 970 F.2d 663 (10th Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993). The *Kotteakos* warning, "When many conspire, they invite mass trial by their conduct," 328 U.S. at 773, 66 S.Ct. at 1252, echoes here. In this case, nine individuals were indicted, five originally sat at defense counsel table; and midway through the trial, two participants in the defense entered pleas and testified for the government. Our review, therefore, must carefully glean the evidence, both direct and circumstantial, taken in the light most favor-

---

11. The court reflected the consequences of this sentence on Lee Roberts, then 45 years old, virtually amounted to a life sentence. Additionally,

the court stated "that a sentence of 36 years carries a price tag in today's dollar of $720,000."

able to the government, which links Roberts, Wood, and Byers to the single conspiracy charged. Ultimately, whether the government met its burden of establishing a single rather than multiple conspiracies was a question of fact that the jury decided. *United States v. Dickey*, 736 F.2d 571, 581 (10th Cir.1984), *cert. denied*, 469 U.S. 1188, 105 S.Ct. 957, 83 L.Ed.2d 964 (1985). Its credibility choices inure to that finding as well.

■ At the core of a single conspiracy is an agreement to break the law. *United States v. Esparsen*, 930 F.2d 1461, 1471 (10th Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 882, 116 L.Ed.2d 786 (1992). Criminalized is the agreement itself. That the illegal act does not materialize is another matter, but our inquiry must decide whether the government produced sufficient evidence to permit the jury to find Roberts, Wood, and Byers agreed to trade in methamphetamine. That single goal provides the "unity of purpose or common design" to which each participant voluntarily agreed. *United States v. Fox*, 902 F.2d 1508, 1514 (10th Cir.), *cert. denied*, 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990) (quoted in *United States v. Harrison*, 942 F.2d 751, 755 (10th Cir. 1991)).

■ The presence of a central figure in this shared goal, however, does not necessarily transform multiple conspiracies into a single conspiracy. Instead, each member of the conspiracy is individually linked to the single agreement by the government's showing the member's actions are mutually dependent on those of confederates. That is, for example, Lee Roberts' agreement to procure methamphetamine depends on his distributors' demands for product, and his ability to front the drugs is assured by his receipt of money due.

■ However "diverse and far ranging," *United States v. Daily*, 921 F.2d 994, 1007 (10th Cir.1990), *cert. denied*, — U.S. —, 112 S.Ct. 405, 116 L.Ed.2d 354 (1991), the activities of each coconspirator may be, "so long as there is sufficient proof of mutual dependence and assistance," *United States v. Maldonado–Rivera*, 922 F.2d 934, 963 (2d Cir.1990), *cert. denied*, — U.S. —, 111

S.Ct. 2858, 15 L.Ed.2d 1025 (1991), a single conspiracy exists. Coconspirators need not know the identities or details of each scheme or have connections with all other members of the conspiracy for a single conspiracy. "Nor do lapses of time, changes in membership, or shifting emphases in the locale of operations necessarily convert a single conspiracy into multiple conspiracies." *Id.* at 963.

■ Therefore, that many codefendants never mentioned Jackie Wood's name or knew Susan Byers does not negate the jury's finding a single conspiracy dedicated to distributing methamphetamine in the Casper area. That purchases and sales occurred in North Las Vegas similarly does not create a separate hub. The government produced sufficient evidence that each defendant participated in the same collective venture with the same goal in mind.

### a. Lee Roberts

■ Officer Van Houten, who stopped Roberts for the helmet violation near Mesquite, Nevada, testified about the marked bill found with the $23,800 placed in the saddlebags of the impounded motorcycle, and Officer Cohee described the money and gun stolen from Roberts in the March 1990 robbery. Officer Tanner testified Jackie Wood told him before the North Las Vegas buy-bust the methamphetamine was "Lee's stuff." Chris Harwell, involved in the Arizona highway accident, described driving Roberts' truck to Las Vegas and his return with Roberts and Wood when he collided with another car. He further revealed Roberts stowed his travelling kit containing methamphetamine in the brush before taking off with Jackie Wood. Cindy Canfield testified Roberts was her supplier, and there was congruence in her description of problems caused by a bad batch of methamphetamine that Roberts fronted her and Roberts' cash problems caused by his inability to recoup the money he paid. Although Emily Estep testified she sold methamphetamine to Roberts in Las Vegas three or four times, the addition of those transactions does not negate the central operating mechanism of the Casper conspiracy. Robyn Baruth, a codefendant, de-

scribed how she received methamphetamine about fifteen times from Roberts and observed him weigh out packages. Numerous intercepted calls introduced into evidence also revealed Roberts was the source of the drugs, his directions about calling distributors to pick up their packages, and his unabating money problems. The government introduced into evidence the black athletic bag in which several witnesses testified Roberts always toted quantities of methamphetamine, cash, and a weapon. Finally, Roberts' statement to Officer Hughes provided details about the means and scope of the operation.

■ The evidence was sufficient to permit the jury to find Roberts was the focal point in a single, albeit multifaceted, conspiracy of which no component countermanded or contradicted the essential goal of distributing methamphetamine.[12] There is no basis in fact for his contention he was at most involved in multiple small conspiracies.

### b. Jackie Wood

■ Although Ms. Wood's relationship to Roberts frequently placed her near the center of the conspiracy, that proximity alone does not prove her interconnection to the entire scheme or validate her contention only multiple conspiracies are shown by the evidence. Ms. Wood purchased the handgun stolen in the March 1990 robbery. Ms. Wood, involved in the Nevada buy-bust, met Agent Tanner at the bar and told him the methamphetamine was "Lee's stuff" before Lee Roberts arrived. Chris Harwell testified he saw Ms. Wood empty her pockets into Roberts' black bag before police arrived at the accident in which they were involved. At Roberts' direction, Ms. Wood mailed a package of methamphetamine on February 1, 1990, from Las Vegas to Carolynn Roberts in Casper.

■ In contrast, there was no evidence or inference from the evidence that Ms. Wood's acts were not linked to the central Casper distribution. Merely because she was not present at the La Quinta arrest scene or wasn't mentioned by coconspirators does not negate the direct and circumstantial evidence presented that she participated in the agreement nor fragments the single conspiracy.

### c. Susan Byers

■ Similarly, Ms. Byers' argument the government at most proved she was a buyer in unrelated transactions is not borne out by the record. Robyn Baruth testified that on Thanksgiving day 1990, Roberts asked her to drive him to Susan Byers' house after he weighed out two packages of methamphetamine. Agent Michael Curran, surveilling Roberts, observed Ms. Byers arrive at Roberts' house on January 22, 1991. On February 1, 1991, Ms. Byers called Carolynn Roberts after she received a message on her answering machine to come and see her. Officer Tony Young testified he observed a postman come to the door of 1010 West 20th and hand Carolynn Roberts a package for which she signed. About three hours later, he observed Ms. Byers arrive at the house, enter and leave within fifteen minutes. Receipts from Western Union money orders dated congruently with packages sent to Carolynn Roberts, which Ms. Byers picked up, were found in the search of Ms. Byers' home.

Against this evidence, Ms. Byers attempted to show Roberts got motorcycle parts for her husband and the activities depicted were just as consistent with her picking up parts and sending payment for the parts.[13] For example, in one of the few intercepted con-

---

**12.** This conclusion eliminates Roberts' and Wood's contention the court erred in permitting evidence of isolated conduct, specifically the Nevada sale of drugs, to be introduced as part of the government's proof defendants were engaged in one grand conspiracy and not numerous separate conspiracies. Defendants contend this evidence was highly prejudicial. However, contrary to Roberts' and Wood's contention, the evidence was probative of the single conspiracy

in which they received methamphetamine in Nevada and distributed it in Wyoming. That a portion was sold in Nevada does not conflict with that proof.

**13.** There was evidence that Lee Roberts and Billy Joe Wood bought and sold cars, repaired motorcycles, and wanted to start a car business together.

versations involving her,[14] on February 11, 1991, she asked Billy Joe Wood if he had heard from Roberts. Billy Joe Wood told her someone wrecked Roberts' motorcycle "so I gotta bring a bunch a parts and, stuff ta fix it up." Ms. Roberts then asked, "He gonna be sendin' anything back, or do you know?" Similarly, Ms. Byers sold Avon products and maintained customer lists and accounts which, she argued, reflected her cosmetics sales and not the illegal drug activity the government claimed.

Nevertheless, having heard all of this evidence, the jury decided Ms. Byers joined in the illegal agreement and rejected her characterization of her activity. Neither the facts nor the law validates her effort to align her involvement to a limited role in only one tangential facet of the conspiracy. Although there was no direct evidence establishing Ms. Byers sold methamphetamine,[15] the circumstantial evidence of multiple deliveries, pickups, her conversations with Carolynn Roberts, Lee Roberts, and Billy Joe Wood set forth more than a simple buyer-seller relationship. In contrast, in *Evans,* 970 F.2d at 673, the government used only one purchase of crack to tie defendant to the larger massive conspiracy without more.

### III. Coconspirator Statements Under Fed.R.Evid. 801(d)(2)(E)

#### a. Lee Roberts and Jackie Wood

■ Roberts and Wood contend the court failed to follow its own flawed procedure to provide a *James* hearing, permitted statements not found in the government's proffer to be admitted into evidence, and erroneously concluded certain statements met the "in furtherance" requirement of Fed.R.Evid. 801(d)(2)(E).[16] The written proffer the court

asked the government to submit, Roberts and Wood maintain, did not specify which of the 971 intercepted calls would, in fact, be used during the trial, and certain statements introduced into evidence were not included in the proffer. Consequently, Roberts and Wood insist the government's summarized proffer could not provide the factual basis for the court to properly conclude a conspiracy existed by a preponderance of the evidence; the declarant and defendant against whom the statements were offered were members of the conspiracy; and the proffered statements were made in its course and in furtherance of the conspiracy. *United States v. Mobile Materials, Inc.,* 881 F.2d 866, 869 (10th Cir.1989), *cert. denied,* 493 U.S. 1043, 110 S.Ct. 837, 107 L.Ed.2d 833 (1990).

In its effort to address objections to the anticipated use of coconspirator statements and confessions, the court rejected defendants' request for an oral proffer as inefficient and opted for the government's written proffer.[17] Noting the potential mass, "440 pages of statements ... 917 telephone calls, 380 were not connected and various others was a connection," the district court suggested if the government could indicate the evidence it intended to use, the witnesses who would be called, the background of the statements, and who made them as part of the proffer, "identify *those that you think are gold* and are going to make a difference in proving the fact that there was an agreement to accomplish a criminal purpose among these defendants," it could make the requisite preliminary findings. Roberts and Wood insist the written proffer did not contain "the gold" and did not specifically identify any statements made in the course of or in furtherance as required by the court's procedure.[18] Moreover, Roberts and Wood list

14. Ms. Byers repeatedly asserts of the 971 intercepted calls, only 6 were relevant to her, and of those, she participated in only 3.

15. The government, in fact, moved to strike the testimony of its witness, Rose Brown, who attempted to testify about individual purchases of methamphetamine she made from Ms. Byers.

16. Defendants underscore this assignment of error does not implicate discovery of the statements acknowledging the prosecutor's open-file

policy and its access to or receipt of hearsay statements and transcripts.

17. The court stated, "And so by writing it down, it affords an opportunity to have some reflection about the statements and how it fits together, not only for your benefit, but also for the government's benefit so that they can see the context at that point and think about it...."

18. Defendants continued to raise objections to the written proffer at various pretrial hearings.

specific recorded conversations, transcripts of the wiretaps, and 801(d)(2)(E) testimony offered in the government's case in chief which were omitted from the *James* proffer.

■ Although our precedent delineates a procedure for a court's determining the predicate facts permitting admission of the hearsay statements of a coconspirator under Fed. R.Evid. 801(d)(2)(E), we have never constructed a fixed formula to govern the *James* prophylaxis. *See United States v. Perez,* 989 F.2d 1574 (10th Cir.1993) (*en banc*); *United States v. Petersen,* 611 F.2d 1313 (10th Cir. 1979), *cert. denied,* 447 U.S. 905, 100 S.Ct. 2985, 64 L.Ed.2d 854 (1980). Indeed, *Bourjaily v. United States,* 483 U.S. 171, 183–84, 107 S.Ct. 2775, 2782–83, 97 L.Ed.2d 144 (1987), which held the Constitution does not require "independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)," expressly eschewed "an opinion on the proper order of proof that trial courts should follow in concluding that the preponderance standard has been satisfied in an ongoing trial." *Id.* at 176 n. 1, 107 S.Ct. at 2779 n. 1. Consequently, whether the court holds a pretrial hearing in which a witness testifies about personal contact with a coconspirator, *United States v. Caro,* 965 F.2d 1548, 1557 (10th Cir.1992), or provisionally admits coconspirator statements subject to their being later connected up and delays its ruling on the question, *United States v. Hernandez,* 829 F.2d 988, 994 (10th Cir.1987), *cert. denied,* 485 U.S. 1013, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988), remains within the discretion of the trial court based on the particular configuration of the government's evidence and the constraints of a multi-defendant trial.

Nevertheless, we are reluctant to approve or condone the substitution of a written proffer for these prototypes with their attendant advantage of, for example, judging the conversation in context or even identifying the speaker. Indeed, in this case, the govern-

ment's proffer mainly summarized the evidence it intended to offer at trial and did not adequately specify which coconspirator statements would be presented to the jury. However, given the district court's concern about the potential unwieldiness of a hearing, its invitation to the parties to press continuing objections, and its contemporaneous rulings and limiting instructions during trial, we cannot say the court abused its discretion in ordering the written proffer.

■ Separate from that discretionary call, however, is the court's finding that particular statements were made in the course of or in furtherance of the conspiracy. We review these findings for clear error. *United States v. Smith,* 833 F.2d 213, 221–22 (10th Cir.1987).

Of the many intercepted calls introduced into evidence, Roberts and Wood cite tape 13A, transcript 13B, a conversation principally between Lee Roberts and Carolynn Roberts, as a prime example of the court's erroneously applying the "in furtherance" test. They maintain this 34–minute conversation, consuming 30 pages of transcript handed to the jury, was mere narrative and idle chatter, all of which dwarfed any possible finding the conversation was intended to promote the conspiratorial objective. In fact, they urge, the discussion of pending criminal cases, Jackie Wood's Nevada sentence, car problems, paying bills, and the President's War on Drugs does not meet the "in furtherance" test as narrowly applied in this Circuit. Defendants rely on *Perez,* which underscored this requirement was "'a *limitation* on the admissibility of co-conspirators' statements that is meant to be taken seriously.'" 989 F.2d at 1578 (quoting *United States v. Johnson,* 927 F.2d 999, 1001 (7th Cir.1991)).

■ Examples of what's "in furtherance" and what's not have been arrayed in *Perez, Caro,* and *Smith,* to name only a few cases. In general, mere narratives between cocon-

Before the government's opening argument, the court reiterated its view:

that the requirements of the *James* hearing have been satisfied by the government and the court is prepared to find by a preponderance that the government has evidence, that [ ] establishes the existence of a conspiracy, mem-

bership of each of these defendants in that conspiracy and that certain statements have been made in furtherance of it.

As previously noted, the court offered to entertain objections and rule on particular statements during the course of trial.

spirators or narrative declarations of past events are not "in furtherance," while statements of future intent that set transactions integral to the conspiracy in motion and maintain the information flow among coconspirators meet the "in furtherance" requirement. "Statements made to induce enlistment or further participation in the group's activities ... to prompt further action on the part of conspirators ... to 'reassure' members of a conspiracy's continued existence ... to allay a coconspirator's fears ... [or] to keep coconspirators abreast of an ongoing conspiracy's activities satisfy the 'in furtherance' of requirement." *United States v. Yarbrough,* 852 F.2d 1522, 1535–36 (9th Cir.), *cert. denied,* 488 U.S. 866, 109 S.Ct. 171, 102 L.Ed.2d 140 (1988) (citations omitted).

"When inquiring whether a statement was made 'in furtherance of' a conspiracy, we do not focus on its actual effect in advancing the goals of the conspiracy, but on the declarant's intent in making the statement." *United States v. Nazemian,* 948 F.2d 522, 529 (9th Cir.1991) (citation omitted), *cert. denied,* —— U.S. ——, 113 S.Ct. 107, 121 L.Ed.2d 65 (1992). As we stated in *Perez,* "[n]o talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy.... To the contrary, this determination must be made by examining the context in which the challenged statement was made." 989 F.2d at 1578–79 (citations omitted).

 Thus, reviewing transcript 13B with these directions in mind, we cannot say the court's finding the conversation furthered the objectives of the conspiracy was clearly erroneous. Interspersed in the banter about paying bills, changing furnace filters, and car trouble, are Lee Roberts' statements cogent to the conspiracy. He told Carolynn Roberts that a package would arrive and gave her instructions about its distribution and perhaps her selling some of the methamphetamine designated for her use to pay bills. Taken in context, these statements are intended to assure Carolynn Roberts of the conspiracy's viability in the face of the comments about Jackie Wood's sentencing, the fear the police might be moving in, and Lee Roberts' own admission against interest.[19] In fact, the trial court, finding the admissions against interest were not strictly against penal interest as the rule requires, decided these admissions "represented talk among coconspirators about the enterprise and considerably about their roles in the enterprise or their activities."[20]

Although we do not interpret Roberts' casual admission of culpability as broadly as did the trial court, we cannot deem the trial court's permissible view clearly erroneous within the context of the entire conversation. *Anderson v. Bessemer City, N.C.,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). Nor would we give as much latitude to the prosecution as did the trial court in refusing to minimize transcript 13B on the ground the greater flow of information was important "to preserve [the conversations] if at all possible if you were in the position of law enforcement." As we have already cautioned, the barrage on the jury of so many conversations usually involving foul language and generally depicting the underside of the drug culture[21] heightens our con-

---

19. In one conversation, Lee Roberts told Billy Joe Wood who took the phone while Carolynn Roberts accepted the package, "Whoa, that's what's got me worried. Shit man, ah they got enough shit on me ta put me away for the rest a my natural life." [Transcript 13B, p. 7].

20. Similarly, defendants objected to Cindy Canfield's testimony about Dave Cook. Cindy Canfield testified Cook, who was not a member of the conspiracy, told her he was getting his methamphetamine from Lee Roberts. Although the prosecutor made an oral proffer under 801(d)(2)(E), the district court made no finding "there was a conspiracy involving the declarant and the nonoffering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *United States v. Perez,* 989 F.2d 1574, 1577 (10th Cir.1993) (*en banc*), citing *Bourjaily v. United States,* 483 U.S. 171, 175, 107 S.Ct. 2775, 2778, 97 L.Ed.2d 144 (1987). Nevertheless, consistent with our discussion in *Perez,* the error did not have a substantial influence on the outcome of the trial and was harmless given the overwhelming evidence of defendants' guilt.

21. In a taped conversation played to the jury between Carolynn Roberts and Peggy Neil, one of Lee Roberts' customers, Carolynn Roberts says, "I just, those people just don't give a shit about nothing or nobody. Except their little chemical."

cern that the jury was able to arrive at individual assessments of criminal conduct. Nonetheless, we are satisfied the trial court's method in evaluating the many 801(d)(2)(E) statements offered and its preliminary rulings and later refinements of those findings comport with the safeguards we have articulated.

### b. Susan Byers

■ More difficult is Ms. Byers' contention the court erred in permitting tape 17A, transcript 17B, into evidence, a conversation between Lee Roberts and Carolynn Roberts devoted entirely to Lee Roberts' financial difficulties. The disputed statement became the cornerstone of the government's case against Ms. Byers and chief characterization of her role in the conspiracy.

On February 9, 1991, with bills overdue and front money slow to come in, Lee Roberts complained:

See and that's what I keep runnin' into up there, people don't pay me.

Carolynn Roberts: Well, Suzzie does don't she and . . .

Lee Roberts: Suzzie pays me, she's the best god damm hand I got.

Ms. Byers asserts the statement made near the end of a 55–minute conversation was mere idle chatter describing a past event. The interchange did not promote the conspiracy, initiate any action, or imply Carolynn Roberts collected money or intended to collect money from her in the future. Consequently, the statement fails to fit the criteria we have established for admission under 801(d)(2)(E), Ms. Byers contends.

We disagree. The court found the statement involving money and evidencing the fronting method of payment reflected Lee Roberts' intent to keep Carolynn Roberts, a member of the conspiracy, "abreast of what is going on, that is, abreast of the status of another person within the alleged conspiracy and their performance under the conspiracy and their role." Relying on *Caro* and *Smith,* the court found "the telephone call relates to efforts to get money and to collect money in promotion of the conspiracy." However damaging a role the comment, repeated six times in the government's closing argument, may have played in Ms. Byers' conviction and sentence, the court's analysis and conclusion comport with our precedent and are not clearly erroneous. The district court did not abuse its discretion in permitting the government to play tape 17A for the jury.

### IV. Lee Roberts' Confession

■ Mr. Roberts contends his confession should have been suppressed because his *Jackson v. Denno* hearing was improper.[22] By ignoring Fed.R.Evid. 104(d)[23] and Fed.R.Evid. 611(b),[24] Mr. Roberts contends the district court permitted the government to elicit statements that exceeded the scope of his direct examination on the question of the voluntariness of his confession and forced him to repeatedly assert his Fifth Amendment privilege. Defendant urges he agreed to testify at the suppression hearing, relying on the limits of Rule 104(d), only to be subjected to inquiry about the indictment itself. Because admission of his confession was so damaging, serving as the factual basis for conviction and sentencing, Roberts insists the court's improper handling of the Rule 104(d) hearing must be redressed.

At the suppression hearing, Mr. Roberts testified when Agent Hughes took his statement in Nevada on February 27, 1991, he was under the influence of methamphetamine, a drug which he stated gives the user

**22.** In *Jackson v. Denno,* 378 U.S. 368, 379, 84 S.Ct. 1774, 1782, 12 L.Ed.2d 908 (1964), the Court invalidated a New York procedure permitting the jury to determine the voluntariness of defendant's confession and held the trial court should hear the evidence of coercion outside the presence of the jury and decide the issue before admitting the confession.

**23.** Fed.R.Evid. 104(d) states: "The accused does not, by testifying upon a preliminary matter, be-

come subject to cross-examination as to other issues in the case."

**24.** Fed.R.Evid. 611(b) states: "Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The court may, in the exercise of discretion, permit inquiry into additional matters as if on direct examination."

a false sense of security; he was not read his *Miranda* rights; he was handcuffed; and officers held a gun to his head. On cross-examination, the government challenged each of these statements and attempted to show defendant was, in fact, rational and functioning properly during that time as evidenced by his ability to direct sales and collect money. Although the trial court sustained a number of defense counsel's objections, it overruled objections to questions about whether Roberts knew what he was doing was illegal, as evidenced by a comment he made about President Bush's speech on the War on Drugs. The court opined, because the hearing measured the sole issue of voluntariness, defendant could not pick and choose what evidence manifested his mental state at the time of his confession. The court ultimately concluded, based on its examination of the totality of the circumstances, defendant's statements were voluntarily made and "not the product of coercion or improper threats upon the defendant nor improper promises."

At the outset, as we understand it, Mr. Roberts' position does not challenge the court's finding of voluntariness as clearly erroneous. Nor does he seek plenary review of the court's legal conclusion admitting the confession. Moreover, Roberts, who did not testify at trial, does not assert his suppression hearing testimony was used during trial. Instead, Mr. Roberts contests the court's procedure, elevating it to constitutional status.

■ While Rule 104(d) embodies the Supreme Court's holding in *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968), permitting a defendant to testify at a suppression hearing without fear his testimony will be used for other than impeachment purposes at trial, the Court has persisted in reading the rule to "promote the defendant's 'obligation to testify truthfully,' at the expense of policies designed to inhibit the violation of constitutional rights." 1 *Weinstein's Evidence,* ¶ 104[11], at 104–92 (1992) (quoting *United States v. Havens,* 446 U.S. 620, 627, 100 S.Ct. 1912, 1916–17, 64 L.Ed.2d 559 (1980)). Although Rule 104(d)

circumscribes the government's cross-examination to the issue of voluntariness, defendant's credibility is inextricably tied to that resolution. In *United States v. Williams,* 754 F.2d 672, 676 (6th Cir.1985), the Sixth Circuit rejected a similar challenge, finding the trial court did not err in compelling defendant to answer the government's question if he knew he was carrying drugs, given his earlier denial he was nervous. The court held the question was proper "because he had placed his own credibility in issue by his earlier testimony." *Id.*

■ Moreover, once defendant takes the stand on this preliminary matter, Rule 104(d) does not permit him to define the question of voluntariness. "There is no federal right to limit the testimony of a witness on a preliminary matter to one single phase of an issue." *United States v. Gomez–Diaz,* 712 F.2d 949, 951 (5th Cir.1983) ("The issue of consent goes beyond a single yes or no answer to the question of whether [defendant] verbally agreed to the x-ray."), *cert. denied,* 464 U.S. 1051, 104 S.Ct. 731, 79 L.Ed.2d 191 (1984).

Given the government's burden of proving voluntariness, the district court did not abuse its discretion in permitting the prosecutor to question Roberts about his awareness and mental capacity to run a business during the time he maintained he was substantially under the influence of drugs. In fact, in denying the motion to suppress, the court judged Roberts' testimony "deceptive." Roberts' present effort of challenging the evidence on which the court relied, however, runs counter to the requirements of Rule 104(d). Moreover, because he neither took the stand at trial nor was the testimony admitted for any purpose, he cannot seriously claim prejudice.

## V. Roberts' § 924(c) Conviction

■ Roberts contends although the evidence may have shown he possessed a .357 magnum revolver and a Raven semiautomatic handgun as listed in Count III, there was no evidence the guns were used during and in relation to a drug trafficking crime as re-

quired by § 924(c).[25] Defendant relies on *United States v. Bruce,* 939 F.2d 1053 (D.C.Cir.1991).

In *Bruce,* the court found a government expert's testimony that "drugs and guns go hand and hand," *id.* at 1054, insufficient to prove use of "a small derringer hidden in a belt buckle stored in a paper bag alongside drugs in the pocket of a raincoat hanging in a closet," *id.* at 1055, in connection with drug distribution. The D.C. Circuit, citing our decision in *United States v. Sullivan,* 919 F.2d 1403, 1432 (10th Cir.1990), *cert. denied,* — U.S. —, 113 S.Ct. 285, 121 L.Ed.2d 211 (1992), also aligned itself with the Second, Third, Fifth, Sixth, and Eighth Circuits in holding § 924(c) does not criminalize simple possession of a handgun. "[T]he evidence must support the inference that the gun was used to protect the defendant's unlawful possession of drugs that he intended to distribute in the future." *Id.* at 1056. Application of this simple possession analysis, however, etherealizes the evidence here.

In this case, defendant told Agent Hughes he always carried a gun when conducting drug business because it's "a dangerous business." Agent Lombardo, testifying at trial, identified the two weapons he seized when Roberts' Nevada trailer home was searched. He noted when found, the Raven semiautomatic weapon later introduced into evidence was equipped with an ammunition clip and had a round in the chamber. Robyn Baruth testified upon walking into Roberts' motor home in Casper, she saw a "pistol type gun" lying on the counter which he put into a drawer. At the same time, Ms. Baruth testified quantities of methamphetamine were being distributed and used.

Unlike *Bruce* and *Sullivan,* the weapons in this case were "an integral part of [defendant's] criminal undertaking and its availability increased the likelihood that the criminal undertaking would succeed." *United States v. McKinnell,* 888 F.2d 669, 675 (10th Cir. 1989) (quoting *United States v. Matra,* 841 F.2d 837, 843 (8th Cir.1988)).[26] Like *United States v. Williams,* 923 F.2d 1397, 1403 (10th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2033, 114 L.Ed.2d 118 (1991), "the firearms were entwined with the drug operation. The success of such a retail distribution operation is predicated upon a steady flow of customers making purchases. The visible presence of firearms is a means of ensuring that none of these customers attempts a robbery." The evidence of Roberts' violation of § 924(c) was ample in this case.

## VI. Ms. Byers' § 843(b) Conviction

Ms. Byers contends the government's proof of her violation of 21 U.S.C. § 843(b),[27] using a telephone to commit a felony under the Controlled Substances Act, is factually insufficient to support her conviction. She maintains the February 1, 1991 call she placed to Carolynn Roberts, also in Casper, lacked the requisite interstate nexus

---

**25.** 18 U.S.C. § 924(c)(1) states in part:

Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years....

**26.** In *Smith v. United States,* — U.S. —, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993), the Court held the exchange of a gun for drugs constituted a "use" under § 924(c)(1). Albeit dicta, the Court clarified the "in relation to" language of § 924(c): "the firearm must have some purpose or effect with respect to the drug trafficking crime; its presence or involvement cannot be the

result of accident or coincidence." *Id.* — U.S. at —, 113 S.Ct. at 2059. Following *Smith,* we have interpreted the "in relation to" language expansively. Indeed, "[w]hen a defendant carries a firearm during a drug trafficking crime as a source of protection or to embolden himself, the firearm has the *potential* to facilitate the drug trafficking crime, regardless of whether it actually facilitates the offense." *United States v. Harmon,* 996 F.2d 256, 258 (10th Cir.1993) (emphasis added).

**27.** 21 U.S.C. § 843(b) states in part:

It shall be unlawful for any person knowingly or intentionally to use any communication facility in committing or in causing or facilitating the commission of any act or acts constituting a felony.... Each separate use of a communication facility shall be a separate offense under this subsection.

to constitute a violation of § 843(b). Additionally, the call, Government Exhibit 14E, made no reference to drugs, money, quantity, price, or other indicia facilitating a drug offense.[28] Instead, the inferences arising from this conversation are consistent with her quest for a package of motorcycle parts, Ms. Byers asserts.

 Section 843(b) penalizes the knowing and intentional use of a telephone to commit, cause, or facilitate a drug crime. As we noted in *United States v. Davis*, 929 F.2d 554, 559 (10th Cir.1991), our interpretation of "use" and "facilitate" is broad, encompassing receiving as well as making calls, *id.;* engaging in a nondescript conversation, *United States v. Reed*, 1 F.3d 1105, 1109 (10th Cir. 1993); and hanging up after a busy signal, *United States v. McIntyre*, 836 F.2d 467 (10th Cir.1987). At trial, Agent Young testified about his surveillance of Carolynn Roberts' house on February 1, 1991, and Ms. Byers' arrival there shortly after a package was delivered. The clear, though unstated, purpose of the conversation was that Lee Roberts had left a message informing Ms. Byers of a present distribution of methamphetamine which prompted her to call and visit Carolynn Roberts. Ms. Byers' contrary characterization of the call, including its lack of an interstate nexus,[29] bears no support in the record.

---

**28.** In this short call, Ms. Byers identified herself to Carolynn Roberts and stated, "I got a message from Lee on my phone.... Said I should come over." Ms. Byers offered to "run over right quick," and the conversation ended.

**29.** Neither the statute nor the case law includes an interstate nexus as an element of the offense.

**30.** We address Roberts' and Wood's objection to quantity separately from that of Ms. Byers. We note Lee Roberts objected to the drug quantity finding in the PSR and objected again at his sentencing hearing, although he does not specifically raise this objection in his brief. Nevertheless, because Ms. Wood's sentence was based on the same 60–pound quantity, and she specifically raised the issue at sentencing, requesting an evidentiary hearing upon which the court did not rule, and preserved the issue on appeal, our resolution necessarily must encompass both defendants.

---

## VII. Sentencing Issues

### A. Drug Quantity

#### (a) Lee Roberts and Jackie Wood [30]

 Defendants challenge the district court's fashioning a guideline sentencing range (GSR) out of laths made of drug quantities that were not charged in the indictment, bear no resemblance to the trial evidence, and lack the rudimentary elements of reliability. Notwithstanding the addition of relevant conduct to the construction, U.S.S.G. § 1B1.3(a), defendants maintain the court's factual finding of 60 to 80 pounds, and final choice of 60 pounds, is clearly erroneous.

 Although the indictment charged defendants distributed "in excess of seven pounds of methamphetamine," and the government professed in oral argument the "in excess" language encompassed the 60–pound quantity of defendants' base offense level, we require more of a blueprint to conduct our review. Indeed, to conclude the district court's finding was not clearly erroneous, we must look to the evidence of quantity in the record as well as that of relevant conduct, "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity that occurred during the commission of the offense of conviction." U.S.S.G. § 1B1.3. As long as we can reconstruct the calculation using the district court's approximations, U.S.S.G. § 2D1.1, comment. (n. 12),[31] "[w]e will not

---

**31.** U.S.S.G. § 2D1.1, comment. (n. 12) states: Types and quantities of drugs not specified in the count of conviction may be considered in determining the offense level. *See* § 1B1.3(a)(2) (Relevant Conduct). Where there is no drug seizure or the amount seized does not reflect the scale of the offense, the court shall approximate the quantity of the controlled substance. In making this determination, the court may consider, for example, the price generally obtained for the controlled substance, financial or other records, similar transactions in controlled substances by the defendant, and the size or capability of any laboratory involved.

If the offense involved both a substantive drug offense and an attempt or conspiracy (*e.g.,* sale of five grams of heroin and an attempt to sell an additional ten grams of heroin), the total quantity involved shall be aggregated to determine the scale of the offense.

In an offense involving negotiation to traffic in a controlled substance, the weight under nego-

disturb this finding 'unless it has no support in the record or, after reviewing all the evidence, we are firmly convinced that an error has been made.'" *United States v. Ortiz,* 993 F.2d 204, 207 (10th Cir.1993) (quoting *United States v. Bernaugh,* 969 F.2d 858, 864 (10th Cir.1992)).

The indictment charged the conspiracy transcended January 1, 1989, through February 26, 1991, although no evidence was produced of any activity during 1989. The government's estimate of quantity is grounded entirely on Lee Roberts' statement, which was summarized and written down by Agent Hughes. After listing several 1–pound purchases Roberts completed or failed to complete in Las Vegas during unspecified time periods, the report states Roberts began purchasing 4–ounce quantities from Dave sometime in 1988. Sometime in the late eighties, "[o]ver the next couple years, ROBERTS improved his business to the point that he was able to buy one, and sometimes two, pounds of product in Las Vegas every week to ten days." The report concluded, "Between *1987* and his arrest, ROBERTS bought 150 to 200 pounds of methamphetamine in Las Vegas which he re-distributed in Casper." The PSR attempted to incorporate this statement with no additional information or corroboration of the drug quantity. In effect, the PSR stated that between January 1, 1989, and February 26, 1991, Roberts "possessed with the intent to distribute and/or distributed approximately sixty to eight [sic] pounds of methamphetamine ... [and] that between *1986* and February 26, 1991, the Defendant distributed between 150 to 200 pounds of methamphetamine...."

Responding to Lee Roberts' objection to the drug quantity reported in the PSR, the district court stated,

> the evidence in this case, largely obtained from the defendant, as to the extent of the deliveries, 150 to 200 pounds of methamphetamine for which the government I think properly credits *in the last stages or during this conspiracy* an amount between 60 and 80 pounds, and we've taken the smallest figure in that regard.[32]

The court buttressed the conclusion by citing the many intercepted telephone calls and Roberts' own admissions and confessions as well as the substantial circumstantial evidence of the conspiracy.

In response to Jackie Wood's contesting quantity, which was grounded on a strenuous *Bruton* objection,[33] the district court cited the considerable trial testimony of drug activity, which necessarily placed Ms. Wood "with Mr. Roberts during these transactions"; "the admission of Mr. Roberts that was made"; the testimony of Cindy Canfield, Shawn Baruth, Carolynn Roberts, and Billy Joe Wood; the "very substantial amounts of money—that [were] traveling by way of postal money order from Susan Byers to Kurlee Roberts during pertinent portions of the conspiracy"; and Lee Robert's notebook "reflecting amounts that were owed, not only by those two persons but by numerous other persons, very substantial amounts of money that were fronted for drugs that were back in the Casper area."

However, except for Lee Roberts' admission, none of the sources mentioned as cor-

---

tiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

**32.** More troubling, after Lee Roberts testified at his hearing to suppress his confession, the district court stated, "Frankly, I view the testimony of Lee Roberts here in this courtroom as being deceptive in that it reflects a very selective memory for events.... Later the court reaffirmed its prior rulings on various motions and clarified:

from a temporal standpoint, indicate that my ruling concerning comments made in findings as to the credibility of Mr. Roberts at the suppression hearing was based not—was based upon my impression of that testimony, of his testimony at the suppression hearing as opposed to any thought about what may have been said when he spoke with Special Agent Hughes.

**33.** The district court rejected Ms. Wood's *Bruton* argument, stating "there was some ability to confront this testimony through cross-examination of Kevin Hughes, although Kurlee Roberts did not testify, did not take the stand during the course of trial."

roboration supplies the requisite factual basis, by inference or approximation, to permit review. Sixty pounds of methamphetamine is 960 ounces, and Roberts stated he rarely fronted more than an ounce at a time, and often only an eighth or quarter ounce because of his difficulty collecting money. At Roberts' wholesale price for acquisition, approximately $1,000 an ounce, the Mesquite ledgers seized in May 1990, reflect at best 15 ounces of methamphetamine. Additionally, the transactions recorded are not dated, nor was there testimony explaining the ledgers. Cindy Canfield, one of his biggest customers, testified she received between one-quarter and one-half pound of methamphetamine during the conspiracy. Robyn Baruth testified she received methamphetamine from Lee Roberts about fifteen times while Roberts had confessed he usually dealt with Shawn Baruth in one-eighth and one-quarter ounce quantities.

■ Although the government's proof need only satisfy a preponderance of the evidence threshold, *United States v. Bernaugh*, 969 F.2d at 864, (citation omitted), a review or extrapolation from these figures and quantities, absent any satisfactory corroborating evidence, does not establish the 60-pound figure. More importantly, our urge to attempt the reconstruction arises because the government's evidence on its face is so impossible to quantify in the first instance. That the district court chose to accept it without additional findings only magnifies its speculative nature. Finally, the ultimate figure cannot be legitimized by placing it against the greater 150 to 200 pound quantities and representing it as a reasonable result. With either figure, 150 pounds or 60 pounds, as the district court acknowledged, defendants faced what amounted to life sentences based primarily on the quantity of drugs involved. Surely because the determination of quantity is so critical to calculating the sentence imposed and the call here produced such onerous sentences, we cannot permit the district court to ground its conclusion in midair.

The Guidelines comment to § 6A1.3 states, "An evidentiary hearing may sometimes be the only reliable way to resolve disputed issues." Given the objections to the drug quantity and the state of the present record, we must reverse Lee Roberts' and Jackie Wood's sentences and remand their cases for the district court to make the requisite factual findings consistent with this opinion.

#### (b) Susan Byers

■ Over her objection to the PSR and argument at her sentencing hearing, the court found "by a preponderance of the evidence, the government has sustained its contention of 39 ounces in this case," which set Ms. Byers' base offense level at 32, triggering the 10–year mandatory minimum of 21 U.S.C. § 841(b)(1)(A). The 39 ounce-figure was based on the government's direct extrapolation from Lee Roberts' statement Ms. Byers received 1 ounce of methamphetamine every two weeks for a year and a half.[34] Ms. Byers countered she did not meet Lee Roberts until June 1990, and no evidence of any involvement with Lee Roberts arose before October 1990. Ms. Byers relied on Carolynn Roberts' and Robyn Cantrell's testimony to substantiate her activity began in the fall of 1990. There was no evidence, Ms. Byers protests, she distributed drugs to anyone or used methamphetamine; nor were drugs found in the search of her home. Wire money transfers between October 31, 1990, and February 26, 1991, totalled $7,030, which the government's evidence showed would purchase only 5 ounces of methamphetamine, although it surmised she had received 15 ounces during those 5 months. Using the government's estimates of cost, however, she would then have owed Roberts more than $15,000 for the purported October to February deliveries. Lastly, she maintains the government failed to produce any evidence to connect her to the conspiracy before October 1990.

---

**34.** The court stated,

> And that would be every two weeks for 18 months equals 39 ounces, which is one ounce during that period of time. And yet for a

> significant—well, towards the end of this, there was a period where it appears that it may have been, for some of those weeks, more than the one ounce every two weeks. So it's a puzzle.

Applying the principles we have just articulated, we again find there is no corroboration of Lee Roberts' statement upon which the court based the final calculation of quantity. Additionally, the court referred to "the statements of your codefendant that you were the best hand he had, always paid your bills, didn't use the drug yourself." The inference about quantity that logically flows from that statement is ambiguous at best and non-probative at worst. As we stated in *Ortiz*, "the relevant issue is not whether Defendant distributed [drugs], but rather the quantity of [drugs] that Defendant distributed." 993 F.2d at 208.

In *United States v. Castaneda*, the Ninth Circuit recently observed:

> Quantity is not an element of a conspiracy offense. Moreover, ... a conspiracy conviction under § 846 does not establish beyond a reasonable doubt that a defendant conspired with every other person charged in the indictment. Rather, a conspiracy conviction "simply means that he agreed with at least one other person to violate the drug laws." The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole,
>
> [u]nder the Guidelines each conspirator, for sentencing purposes, is to be judged not on the distribution made by the entire conspiracy *but on the basis of the quantity of drugs which he reasonably foresaw or which fell within "the scope" of his particular agreement* with the conspirators.

*United States v. Castaneda*, 9 F.3d 761, 769–70 (9th Cir.1993) (citations omitted) (quoting *United States v. Petty*, 992 F.2d 887, 890 (9th Cir.1993) (emphasis added)).

Apart from Lee Roberts' statement, we find independent corroboration of only a small portion of the quantity of methamphetamine attributed to Ms. Byers. We therefore reverse Ms. Byers' sentence and remand her case to the district court for the appropriate further findings.

## B. Role in the Offense

### (a) Lee Roberts

█ Lee Roberts challenges the 4–level increase in his sentence attributed to his role in the conspiracy as an "organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Instead, Roberts maintains, he was a friend or relative but not the person to whom all answered. His role, he distinguishes, was more akin to that described in *United States v. Smith*, 951 F.2d 1164 (10th Cir.1991) (although defendant participated in illegal loans, no evidence borrowers answered to him); and *United States v. Litchfield*, 959 F.2d 1514 (10th Cir. 1992) (although defendant was an important figure in fraudulent scheme, he did not recruit, exercise decision-making authority, or control any member of the conspiracy).

After entertaining Mr. Roberts' objection and countervailing arguments, the district court stated,

> Kurlee Roberts, simply by observation in this courtroom, is to this very day, the major figure. He is the person who has influence. What he says and said throughout this trial, sitting there, watching, he was the person who had knowledge, who had intelligence.... He was—he is the important figure in this. The evidence clearly indicates that there would—there would have been no major drug distribution network, as proven here, without Kurlee Roberts, who is a creative, intelligent human being.

Later, the court observed,

> I believe the defendant is the person who possessed the sophistication to accomplish planning and to design the success of this conspiracy.... He had a big family, the hangers-on. Money for Carolyn's rent—I mean Carolyn's heat, the money for Billy's travel, the meals that he bought, the high living, the drugs, the women and the alcohol.

█ "In enhancing a defendant's sentence based on his role in the offense, a district court must make specific factual findings as to that role." *United States v. Stevens*, 985 F.2d 1175, 1184 (2d Cir.1993). Although we consider the district court's factual findings under the clearly erroneous stan-

dard, *United States v. Cox*, 934 F.2d 1114, 1126 (10th Cir.1991), we review the application of the guideline de novo. *United States v. Smith*, 951 F.2d at 1170. Generalized or random observations that help to shade in defendant's role may assist the reviewing court in arriving at a conclusion; however, they cannot alone substitute for the inquiry under § 3B1.1(a).

■ To impose the 4–level increase, the sentencing court must make two findings of fact: first, that defendant is an organizer or leader; and, second, that the criminal activity involved five or more participants or was otherwise extensive. The Commentary provides some guidance to assess defendant's leadership role. It states:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. § 3B1.1, comment. (n. 4).

Given the factors "the court should consider" before imposing the 4–level increase, we are instead presented with a character sketch which does not assist our review. While these findings are not clearly erroneous, however, they do not fulfil the specific criteria mandated by § 3B1.1(a). "Section 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." *Litchfield*, 959 F.2d at 1523. That Lee Roberts is creative or pays Carolynn Roberts' bills does not make him an organizer or leader under § 3B1.1(a). Nor does the prosecutor's statement at sentencing, which the government now suggests fills that gap;

the probation officer's response to defendant's objection in the PSR; or the evidence at trial substitute for the court's expressed factual findings. While sufficient support for the increase may also be found in the record, "it is not this court's role to make the factual findings necessary to support a sentencing calculation; that is the task of the district court." *United States v. Tai*, 994 F.2d 1204, 1212 (7th Cir.1993) (citation omitted). Accordingly, with these instructions in mind, we remand defendant's sentence to the district court to make the appropriate factual findings necessary to the conclusion the 4–level increase is warranted by § 3B1.1(a).

### (b) Jackie Wood

■ The district court increased Ms. Wood's sentence 3 levels under U.S.S.G. § 3B1.1(b),[35] stating,

> The third area is her role as a manager, and there really is not much to say about that except that *there is ample testimony of her activity*, not only of a person distributing, delivering, assisting in making arrangements for methamphetamine, but she was also someone who acted as a source of methamphetamine to promote this activity in Casper, Wyoming.

(emphasis added). Ms. Wood concedes although she was Lee Roberts' "girlfriend, fiancee, lover for her boyfriend," it was error for the district court to equate that personal relationship necessarily placing her close to him with the role of a supervisor or manager. Added to all of the other family relationships previously mentioned, her proximity to Roberts alone, she insists, cannot satisfy the court's legal conclusion to impose the 3–level increase.

■ We have understood the term "supervisor" to apply to a defendant who "exercised some degree of control over others involved in the commission of the offense or [ ] must have been responsible for organizing others for the purpose of carrying out the crime." *United States v. Reid*, 911 F.2d 1456, 1464 (10th Cir.1990), (*citation omit-*

---

**35.** U.S.S.G. § 3B1.1(b) states: "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels."

*ted* ), (if defendant exercised some degree of control or organizational authority over someone subordinate to him in the drug distribution scheme, defendant qualifies as a supervisor under U.S.S.G. § 3B1.1(a) and (b)), *cert. denied,* 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991). By itself, a close personal relationship with the leader or organizer of a conspiracy does not prove defendant acted as a manager or supervisor. Therefore, a 3–level increase under § 3B1.1(b) can be predicated only on evidence defendant acted in a supervisory or managerial capacity *independent* of any intimate connection to the major player in the criminal activity. *See United States v. Palomo,* 998 F.2d 253, 257–58 (5th Cir.) (no error in rejecting defendant's argument his father's role as organizer of drug conspiracy led to his § 3B1.1(b) increase where defendant met with drug transporter, participated in shipping drugs, recruited a coconspirator, and travelled to Mexico to pay a bribe), *cert. denied,* —— U.S. ——, 114 S.Ct. 358, 126 L.Ed.2d 322 (1993); *United States v. Pofahl,* 990 F.2d 1456, 1481 (5th Cir.) (no error in applying § 3B1.1(b) to organizer's wife who negotiated price, recruited other conspirators, and directed other members), *cert. denied,* —— U.S. ——, 114 S.Ct. 266, 126 L.Ed.2d 218 (1993); *United States v. Brooks,* 957 F.2d 1138, 1152 (4th Cir.) (3–level increase proper where testimony organizer's wife transported and paid employees of drug operation, collected money from and distributed drugs to employees, purchased cocaine when supply was low and effectively ran the operation while her husband was ill), *cert. denied,* —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992); *United States v. Smith,* 893 F.2d 1269, 1275 (11th Cir.1990) (§ 3B1.1(b) increase supported by evidence defendant supervised marijuana cultivation crew; received, paid for and distributed methamphetamine; provided armed backup for drug transaction).

Here, the district court found Ms. Wood had a "lengthy and ongoing" relationship with Lee Roberts and described her role as "a person distributing, delivering, assisting in making arrangements for methamphetamine," and "acted as a source of methamphetamine to promote this activity in Casper, Wyoming." Although these findings are not clearly erroneous, they do not constitute evidence of *decision-making* authority or control over a subordinate necessary to conclude Ms. Wood was a supervisor or manager. Having combed the record to gather the "ample testimony of her activity," we discern the testimony of the Casper robbery she reported; the Nevada buy-bust; the Arizona accident with her effort to assist Roberts in hiding the drugs; the single intercepted conversation, Government Exhibit 2B, in which Lee Roberts described his financial problems to Wood who was solicitous and eager to help; testimony Lee Roberts instructed Jackie Wood to send a package of methamphetamine to Carolynn Roberts; and Agent Young's summary of Jackie Wood's statement.[36] Few coconspirators mentioned Jackie Wood or described any activity involving her.

Not only are we at a loss to uncover the evidence of her decision-making activity, but also we find no evidence of her control of anyone. We therefore conclude there is no basis for the enhancement, and the court erred in applying the 3–level increase to Ms. Wood's sentence. We vacate that portion of her sentence.[37]

36. In his summary of her statement, Agent Young wrote Ms. Wood stated she and Roberts sold drugs for some time, and she set Roberts up with "Jeff" who sold methamphetamine to Roberts. She stated Roberts began dealing with John Wales, another supplier, whom she never met. Finally, Ms. Wood described the Arizona accident and her attempt to wipe their fingerprints off Robert's bag and hide it in her pants when Roberts grabbed it from her and threw it into the underbrush.

37. An analogy can be drawn between Ms. Wood's role and that of a steerer, "a person who 'direct[s] buyers to sellers in circumstances in which the sellers attempt to conceal themselves from casual observation.'" *United States v. Sostre,* 967 F.2d 728, 733 (1st Cir.1992) (quoting *United States v. Copeland,* 902 F.2d 1046, 1049 (2d Cir.1990) (quoting *United States v. Colon,* 884 F.2d 1550, 1552 (2d Cir.), *cert. denied,* 493 U.S. 998, 110 S.Ct. 553, 107 L.Ed.2d 550 (1989)). However, as found in *Sostre,* this bringing together activity does not constitute a leadership or supervisory role.

## C. Specific Offense Characteristics Applied to Ms. Wood

■■■ Ms. Wood contends the district court selectively applied U.S.S.G. § 2D1.1(b)(1) to her alone of all the coconspirators, adding 2 levels to her sentence based on its finding she knew Lee Roberts possessed a dangerous weapon. She relies on the arguments presented in *United States v. Goddard*, 929 F.2d 546 (10th Cir.1991), to advance her claim this selective application of § 2D1.1(b)(1) was fundamentally unfair and violated her right to due process. Ms. Wood maintains the only gun which properly might serve to increase her sentence was the one stolen in the March 7 robbery. Because Lee Roberts was acquitted of the § 924(c) charge tied to this weapon, it was clear error, she insists, to resurrect that charge to increase her sentence.

Evaluating the facts through the lens of U.S.S.G. § 1B1.3, relevant conduct, the district court rejected this objection and applied § 2D1.1(b)(1). It found Ms. Wood "was present with Kurlee Roberts, her protege, her mentor, who was carrying firearms, because the drug business is dangerous—to protect the stash and to protect the drugs." This finding is not clearly erroneous and supports the 2–level increase.

Although Ms. Wood would confine her connection to the single weapon she acknowledged she purchased for Lee Roberts, the Guidelines and our precedent embrace a broader application of § 2D1.1(b)(1) and § 1B1.1(a). Indeed, we have already rejected her argument in *Goddard*, 929 F.2d at 548–49, based on the Commentary's directive "the [§ 2D1.1(b)(1) ] adjustment should be applied [in a drug conspiracy] if the weapon was present, unless it is clearly improbable that the weapon was connected with the [conspiracy] offense." *Id.* at 548 (quoting U.S.S.G. § 2D1.1, comment. (n. 3)). Just as we found it was "clearly improbable" Goddard did not know his coconspirator possessed the gun found during a search when codefendants travelled together to buy drugs, so, too, Ms. Wood's "knowing and voluntary complicity with the possessor of the gun where [she] knew the gun was present and it was connected to the conspiracy," *id.* at 549, is sufficient to support the court's application of § 2D1.1(b)(1). Ms. Wood accompanied Lee Roberts in many of his dealings and knew he kept a weapon with his drugs in the duffle bag he always carried. That knowledge and her presence, standing alone, balance the reasonable foreseeability equation of § 2D1.1(b)(1) and § 1B1.1 that we accepted in *Goddard*.

■■■ Moreover, in reaching this conclusion, we reject Ms. Wood's unsupported suggestion to join other Circuits and require more than a preponderance of the evidence to support the increase. However, unlike the evidentiary threshold necessary for a conviction under § 924(c), the Guidelines require only that a preponderance of the evidence supports these fact-bound determinations. *Goddard*, 929 F.2d at 549. The Guidelines fully contemplate that the consequences of being convicted of participating in a conspiracy may be greater than the sum of all of its parts for certain of its participants, Ms. Wood's disproportionality argument notwithstanding.

## D. Computation of Ms. Wood's Criminal History

■■■ Ms. Wood challenges the district court's computation of her criminal history resulting in a Criminal History Category V. The total score of 9 reflected, in part, 3 points for her Nevada state drug conviction and 3 points for three prior driving while under the influence convictions.[38] In oral argument, the government conceded error in the three criminal history points for her Nevada conviction but defended the additional points reflecting Ms. Wood's uncounseled misdemeanor convictions.

At Ms. Wood's sentencing hearing, the district court accepted into evidence from the probation office copies of her three prior convictions. It then concluded the government had met its burden of proving the fact of her prior convictions while defendant was

---

38. Although the PSR recommended 11 criminal history points, the court did not include 2 points reflecting the instant offense was committed while under any criminal justice sentence. U.S.S.G. § 4A1.1(d).

unable to establish their constitutional invalidity.

The PSR listed three DWI offenses for which 3 points were assessed. Although Ms. Wood was represented by counsel for one offense resulting in a 6–month jail sentence with all but 21 days suspended, the PSR does not reflect the circumstances of the two additional DWI's for which monetary fines and counseling were imposed. Defense counsel represented at her sentencing hearing that he was unable to acquire the necessary records to argue the constitutional invalidity of counting these two uncounseled misdemeanors.

While this appeal was pending, the Supreme Court granted certiorari to resolve the split in the Circuits over whether prior uncounseled misdemeanor convictions may be counted in calculating a defendant's criminal history score. *United States v. Nichols*, 979 F.2d 402 (6th Cir.1992), *cert. granted in part,* — U.S. ——, 114 S.Ct. 39, 125 L.Ed.2d 788 (1993). Given the state of the law and the record before us, we shall defer ruling on this issue. Should the Court resolve the issue favorably to Ms. Wood, she may request a reopening of this appeal. In the meantime, on remand, the district court should recalculate Ms. Wood's criminal history score to subtract the 3 points reflecting her Nevada state drug conviction.

### VIII. Conclusion

In sum, we **AFFIRM** the convictions of Mr. Roberts, Ms. Wood, and Ms. Byers. We **REVERSE** each defendant's sentence and **REMAND** for the district court to hold an evidentiary hearing to create the factual record for the drug quantity involved in each case. We further **REMAND** consistent with this opinion for the district court to articulate the factual basis for Mr. Roberts' 4–level increase as a leader or organizer. We **REVERSE** the court's conclusion Ms. Wood was a manager or supervisor in this conspiracy and **REMAND** for the court to recalculate her criminal history consistent with the prior discussion.