UNITED STATES of America, Plaintiff–Appellee,

v.

Nick Alfred OWENS, Defendant–Appellant.

UNITED STATES of America, Plaintiff–Appellee,

v.

Kevin Lee JOHNSON, Defendant–Appellant.

Nos. 94–6409, 94–6424 and 94–6411.

United States Court of Appeals, Tenth Circuit.

Nov. 15, 1995.

Leslie M. Maye, Assistant United States Attorney (Patrick M. Ryan, United States Attorney with her on the brief), Oklahoma City, Oklahoma, for Plaintiffs–Appellees.

Donald A. Herring of Schnetzler/Strealy, Oklahoma City, Oklahoma, for Defendant–Appellant in Nos. 94–6409 and 94–6414.

Robert K. Weinberg (Nola M. McGuire with him on the brief), Irvine, California, for Defendant–Appellant in No. 94–6411.

Before BRORBY, BARRETT and LOGAN, Circuit Judges.

BRORBY, Circuit Judge.

A jury convicted Nick Alfred Owens and Kevin Lee Johnson of one count of conspiracy to distribute "cocaine powder and/or cocaine base" in violation of 21 U.S.C. §§ 841(a) and 846. It also convicted Nick Owens of one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g); and convicted Kevin Johnson of one count of aiding and abetting interstate travel in aid of racketeering in violation of 18 U.S.C. §§ 2 and 1952(a)(3); one count of using a wire transfer to facilitate the distribution of cocaine powder and/or cocaine base in violation of 21 U.S.C. § 843(b); and one count of aiding and abetting the use of a wire transfer to facilitate the distribution of cocaine powder and/or cocaine base in violation of 18 U.S.C. § 2 and 21 U.S.C. § 843(b).

In this consolidated appeal, Nick Owens and Kevin Johnson challenge their conspiracy convictions and sentences. Mr. Owens also challenges his conviction for being a felon in possession of a firearm. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and affirm the convictions, but remand both Nick Owens' and Kevin Johnson's cases to the district court for resentencing in accordance with this opinion.

A grand jury returned a twenty-nine-count indictment charging Kevin Lee Johnson, Nick Alfred Owens, and ten other individuals with various crimes committed during the course of a six-year conspiracy to distribute cocaine in the Musgrave Addition area of Oklahoma City.[1] Seven of the twelve en-

1. The twelve individuals charged in the indictment were Timothy Johnson, Morris Johnson, Kevin Johnson, Floyd Bush, Charles Watson, Jerome Owens, Nick Owens, Chiquita Owens, William Gaines, Ramon Cartznes, Zyrone Woody, and Larry Stutson. As the surnames suggest, many of the defendants are related.

tered into plea agreements with the government, and the remaining defendants, Timothy Johnson, Kevin Johnson, Nick Owens, Chiquita Owens, and William Gaines, were tried together. Nick Owens and Kevin Johnson moved for judgments of acquittal on all counts at the close of the government's case in chief. Fed.R.Crim.P. 29(a). The district court denied the motions and the jury found both Mr. Owens and Kevin Johnson guilty as charged.

The evidence at trial, which included the testimony of coconspirators Morris Johnson, Floyd Bush, Charles Watson, Ramon Cartznes, and Larry Stutson, showed the following: At the end of 1987, Nick Owens began supplying his nephew Morris Johnson with one-quarter to one-half ounce of crack cocaine once or twice per week. After Morris Johnson sold the cocaine, he returned half of the money to Nick Owens and kept the other half. Nick Owens also supplied crack cocaine to his brother, Jerome Owens, for resale. In May 1988, Nick Owens began supplying his other nephew, Timothy Johnson, with the same amount of crack cocaine for resale. Later in 1988, Morris and Timothy Johnson hired Floyd Bush, their cousin Ronnie Johnson, Charles Watson, Arthur Westerbrook, and Devin Prince to help them resell the cocaine Nick Owens supplied to them. Morris and Timothy Johnson paid them $10 for every $50 worth of crack cocaine they sold. By late 1989, Nick Owens had begun supplying Morris and Timothy Johnson with as much as an ounce of crack cocaine at a time.

Occasionally, Nick Owens supplied Morris and Timothy Johnson with cocaine powder instead of crack cocaine. Morris and Timothy's customers would only buy crack cocaine, not cocaine powder, and at that time they did not know how to cook powdered cocaine into crack cocaine, so they hired William Gaines. Mr. Gaines received $100 for every half-ounce of cocaine he cooked. Mr. Gaines taught Morris and Timothy Johnson how to cook cocaine some time before the summer of 1992. In the summer of 1992, Timothy Johnson and William Gaines cooked one kilogram of cocaine together. After he taught Morris and Timothy Johnson how to

cook cocaine, Mr. Gaines continued to participate in the organization by acting as a lookout and notifying Timothy Johnson by walkie-talkie if the police were nearby.

By the fall of 1991, Nick Owens had begun smoking crack cocaine himself and was no longer a reliable source of cocaine for the organization. In November 1991, Kevin Johnson introduced Timothy Johnson to Ramon Cartznes in a motel room in Oklahoma City. Before the meeting, Kevin Johnson told Mr. Cartznes that Timothy Johnson was selling cocaine in Oklahoma City and that they could "make some money." After the meeting, Kevin Johnson and Mr. Cartznes flew back to California together. At that time, it was Mr. Cartznes' understanding that he would be the organization's new supplier. Timothy Johnson later introduced Ramon Cartznes to Morris Johnson as "the new supplier," and told him that Mr. Cartznes could supply half-kilogram and one-kilogram shipments of cocaine once or twice per week. Kevin Johnson acted as an intermediary between Mr. Cartznes and Timothy Johnson thereafter. Mr. Cartznes continued to supply Kevin and Timothy Johnson until February 1994.

In the summer of 1992, Charles Watson, Timothy Johnson, and two others drove to Los Angeles and picked up one-half kilogram of cocaine at Kevin Johnson's apartment, supplied by Mr. Cartznes. Two or three weeks later, Timothy Johnson and two others drove out to California again to pick up another one-half kilogram of cocaine because they had sold all that they had gotten on the last trip. In January 1993, Timothy Johnson paid his cousin Chiquita Owens $500 to "body pack" one-half kilogram of cocaine and transport it from California to Oklahoma City on a commercial airline. Around the same time, Timothy Johnson paid his uncle, Jerome Owens, $500 to transport the same amount of cocaine in the same way.

On January 23, 1993, Morris Johnson wired Timothy Johnson and Charles Watson $700 because they told him someone had robbed them while they were in California and taken $17,000 in cash they planned to deliver to Mr. Cartznes as payment for an earlier shipment of cocaine. Other testimony

indicates, however, Timothy Johnson and Charles Watson were not robbed, but Ronnie Johnson, who drove out with them, had given the money to another dealer only to discover later that he had purchased cake mix rather than cocaine powder. They told Mr. Cartznes the police had taken the money.

Shortly thereafter, Chiquita Owens, Charles Watson, and Ronnie Johnson started to drive to California to deliver $10,000 to Mr. Cartznes for drugs he had supplied earlier and pick up more cocaine, but their car broke down on the way. Ms. Owens had the money in her purse. Later in 1993, Timothy Johnson, Ronnie Johnson, Larry Stutson, and Devin Prince drove to California to pick up one-half kilogram of cocaine. Ronnie Johnson and Devin Prince were arrested in Arizona on the return trip. Nick Owens also drove to California and picked up shipments of between one-half and one kilogram of cocaine from Mr. Cartznes for Timothy Johnson on at least three occasions. Mr. Owens drove out a fourth time to deliver money to Mr. Cartznes and pick up more cocaine, but Mr. Cartznes' supplier was dry.

Mr. Cartznes also sent ten shipments of between five ounces and one-half kilogram of cocaine to Oklahoma City by UPS. Once, after Kevin Johnson had signed for a package containing one-half ounce of cocaine from Mr. Cartznes, Robert Malone stole it from him at gunpoint. On some occasions, Kevin Johnson carried the money back to Los Angeles to pay Mr. Cartznes, and on other occasions Charles Watson and others wired money to Kevin Johnson and others in Los Angeles by Western Union, to be turned over to Mr. Cartznes as payment for cocaine.

In addition to the above, Chiquita Owens occasionally distributed 2.5 kilogram doses of crack cocaine, supplied by Timothy Johnson and helped Chris Scott reach Timothy Johnson to buy drugs when Timothy Johnson did not respond to his pager. Mr. Gaines also occasionally sold small amounts of crack cocaine. Edwin Smith made a controlled buy of one-half ounce of crack cocaine from Mr. Gaines on February 25, 1994.

**I. Contentions Relating to Guilt**

**A. Admission of Statements by Coconspirators**

 Mr. Johnson contends the district court erred in admitting certain out-of-court statements by his coconspirators as nonhearsay pursuant to Fed.R.Evid. 801(d)(2)(E).[2] Before admitting evidence under this rule, " 'The court must determine that (1) by a preponderance of the evidence, a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy.' " *United States v. Urena*, 27 F.3d 1487, 1490 (10th Cir.) (quoting *United States v. Johnson*, 911 F.2d 1394, 1403 (10th Cir.1990), *cert. denied*, 498 U.S. 1050, 111 S.Ct. 761, 112 L.Ed.2d 781 (1991)), *cert. denied*, — U.S. ——, 115 S.Ct. 455, 130 L.Ed.2d 364 (1994). The district court may make these factual determinations using either of two procedures: (1) It may hold a *"James* hearing," *see generally, United States v. James*, 590 F.2d 575 (5th Cir.), *cert. denied*, 442 U.S. 917, 99 S.Ct. 2836, 61 L.Ed.2d 283 (1979), outside the presence of the jury to determine whether the predicate conspiracy existed, or (2) it may provisionally admit the evidence with the caveat that the evidence must "connect up" during trial, *i.e.*, that the party offering the evidence must prove the existence of the predicate conspiracy through trial testimony or other evidence. *Urena*, 27 F.3d at 1491. The former procedure is "strongly preferred" in this Circuit. *Id.*

Here the district court chose to hold a *James* hearing. The government called only one witness, FBI Special Agent John Hersley. Mr. Johnson objected and requested the court require the government to place his coconspirators on the stand and allow him to cross-examine them. The district court overruled the objections and, after hearing Special Agent Hersley's testimony, concluded the government had proven there was a con-

2. Fed.R.Evid. 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

spiracy between Timothy Johnson, Kevin Johnson, Nick Owens, Chiquita Owens, William Gaines, and others from 1988 to 1994, but the government had not yet proven by a preponderance of the evidence that Chiquita Owens and Kevin Johnson "entered into a conspiracy for the entire course alleged in the indictment." However, the district court allowed the government to introduce the co-conspirator statements provided they were "prefaced by some showing of the time and involvement of [Chiquita Owens and Kevin Johnson] at the time in question" and it was "obvious from the context at the time [the statement was] offered that it [was] in furtherance of this conspiracy and in the course of it." The district court also expressly stated its finding was based not only on the actual coconspirator statements the government sought to admit, but also on "independent proof" of the conspiracy.

The order of proof the district court applied was consistent with our holding in *Urena* and we find no abuse of discretion. *See United States v. Williamson*, 53 F.3d 1500, 1517 (10th Cir.) (order of proof chosen by district court reviewed for abuse of discretion), *cert. denied*, —— U.S. ——, 116 S.Ct. 218, 133 L.Ed.2d 149 (1995); *United States v. Roberts*, 14 F.3d 502, 514 (10th Cir.1993) ("we have never constructed a fixed formula to govern the *James* prophylaxis"); *Urena*, 27 F.3d at 1491. Kevin Johnson contends, however, the district court's finding a predicate conspiracy existed was clear error because it relied solely on Special Agent Hersley's summary of the information his coconspirators provided after entering into plea agreements with the government. *See Williamson*, 53 F.3d at 1517 (district court's finding a predicate conspiracy existed is reviewed for clear error). According to Mr. Johnson, the government was required to corroborate the information his coconspirators gave Special Agent Hersley with independent evidence, which he defines as evidence from a source other than his coconspirators.

■ Mr. Johnson's contention lacks merit. In *Bourjaily v. United States*, 483 U.S. 171, 181, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987), the Supreme Court held the district court may consider and rely on the actual coconspirator statements the government seeks to admit to determine whether a predicate conspiracy existed within the meaning of Fed.R.Evid. 801(d)(2)(E). We have repeated that holding time and time again in our decisions. *See, e.g., United States v. Hernandez*, 829 F.2d 988, 993 (10th Cir.1987), *cert. denied*, 485 U.S. 1013, 108 S.Ct. 1486, 99 L.Ed.2d 714 (1988). However, the Court expressly declined to consider in *Bourjaily* what, if any, other limitations there might be on types of evidence the district court may consider. *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781. However, the Supreme Court made it abundantly clear that Fed.R.Evid. 104(a) governs the matter. *Id.* at 177–81, 107 S.Ct. at 2779–81. That rule provides: "Preliminary questions concerning ... the admissibility of evidence shall be determined by the court.... In making its determination it is not bound by the rules of evidence except those with respect to privileges." Thus, although the Supreme Court did not need to reach the issue in *Bourjaily*, the clear message of that decision is that in deciding whether the offering party has satisfied its burden at a *James* hearing, the district court has the discretion to consider any evidence not subject to a privilege, including both the coconspirator statements the government seeks to introduce at trial and any other hearsay evidence, whether or not that evidence would be admissible at trial. Applying this conclusion to the case now before us, it appears that even if the out-of-court statements the coconspirators made to Special Agent Hersley during the course of the investigation and which he later summarized at the *James* hearing were hearsay within the meaning of Fed.R.Evid. 801(c), they were nevertheless admissible at that stage of the proceedings.

■ In *Bourjaily*, the Supreme Court left open the question whether the district court may rely *solely* on the coconspirator statements the government seeks to admit, or whether the government must also produce other, "independent evidence" of conspiracy. *Bourjaily*, 483 U.S. at 181, 107 S.Ct. at 2781. We have since held *Bourjaily* requires "at most, there ... be some independent evi-

dence linking the defendant to the conspiracy." *United States v. Martinez*, 825 F.2d 1451, 1453 (10th Cir.1987). However, such independent evidence may be sufficient even though it is not "substantial." *United States v. Rascon*, 8 F.3d 1537, 1541 (10th Cir.1993).

■ Contrary to Mr. Johnson's contention, there is nothing in *Bourjaily* to suggest the "independent evidence" must come from some source other than a member of the conspiracy or that it cannot be an out-of-court statement by a coconspirator to a government agent during an investigation. To the contrary, we have defined "independent evidence" as simply "evidence other than the proffered [coconspirator] statements themselves." *Martinez*, 825 F.2d at 1451. In addition, we have held a coconspirator's testimony regarding "direct observations and contacts with defendant" qualifies as independent evidence. *Hernandez*, 829 F.2d at 995; *see also United States v. Doran*, 882 F.2d 1511, 1526 (10th Cir.1989).

In this case, Special Agent Hersley did more than summarize the coconspirator statements the government sought to introduce against Kevin Johnson at trial pursuant to Fed.R.Evid. 801(d)(2)(E). Special Agent Hersley testified Kevin Johnson's coconspirators told him they had firsthand knowledge that (1) Mr. Johnson introduced his brother Timothy to the organization's Los Angeles supplier, Ramon Cartznes, in 1991, (2) Mr. Johnson wired money from Oklahoma to Mr. Cartznes in Los Angeles, and (3) Mr. Johnson put one-half kilogram of cocaine into a car in Los Angeles so that Ronnie Johnson and Devin Prince could transport it to Oklahoma. Ostensibly, this is the independent evidence to which the district court referred when it made its finding. In light of this evidence and the other evidence introduced at the *James* hearing, the district court did not clearly err.

Despite the conclusion we reach in this case, we do not suggest there are no limits of any kind on the use of summary testimony or other summary evidence during a *James* hearing. Our decision in *United States v. Roberts*, 14 F.3d 502, 513–14 (10th Cir.1993) is instructive on this point. In *Roberts*, the district court ordered the government to sub-

mit a written proffer summarizing 911 telephone calls it had intercepted. It denied the defendants' request for an oral proffer because that procedure would be inefficient given the volume of the evidence. We made it clear we were "reluctant to approve or condone" the district court's reliance on the government's written proffer because this summary procedure undermined the district court's ability to evaluate the telephone conversations in context or even identify the speakers and because the written proffer did not adequately specify the particular coconspirator statements the government planned to introduce at trial. *Id.* at 514. We concluded, however, the district court did not abuse its discretion by using this written summary procedure because "the potential unwieldiness of a hearing, [the district court's] invitation to the parties to press continuing objections, and its contemporaneous rulings and limiting instructions during trial" outweighed its shortcomings. *Id.* Just as in *Roberts*, we decline to broadly and unequivocally endorse the summary procedure used in this case. Instead, we will continue to entrust the matter to the discretion of the district court to be decided in light of the particular circumstances of each case.

■ Kevin Johnson also contends the district court erred by admitting two coconspirator statements during trial because the government failed to show they were made in the course and in furtherance of the conspiracy. The first is coconspirator Arthur Westerbrook's testimony that coconspirator Timothy Johnson's "right-hand man" Charles Watson told him Kevin Johnson was the person Timothy Johnson "was dealing with from California." The second is Charles Watson's testimony that coconspirator Ramon Cartznes was "a major drug dealer from the west coast area," he supplied Timothy Johnson with cocaine, and Timothy Johnson met Mr. Cartznes through his half-brother Kevin Johnson. These statements were "in furtherance of the conspiracy" under our case law. *See Williamson*, 53 F.3d at 1520 (statements identifying other members of the conspiracy and statements describing their roles in the conspiracy are "in furtherance of the conspiracy"). They were also made

"during the course" of the conspiracy. A coconspirator statement is made "during the course" of the conspiracy if it is made before " 'the objectives of the conspiracy have either failed or been achieved.' " *United States v. Perez,* 989 F.2d 1574, 1579 (10th Cir.1993) (en banc) (quoting the Advisory Committee Note to Fed.R.Evid. 801(d)(2)(E)). The objective of the conspiracy in this case, to distribute cocaine in the Musgrave Addition area of Oklahoma City, was being vigorously pursued at the time both of these coconspirator statements were made.

### B. Sufficiency of the Evidence to Support the Conspiracy Convictions

▆▆▆▆ Nick Owens and Kevin Johnson both contend there was insufficient evidence to support their convictions for participating in a single, unified conspiracy to distribute cocaine in the Musgrave Addition area of Oklahoma City, as charged in the indictment. Rather, they contend that, if anything, the evidence showed there were several different conspiracies. We disagree. It is well established that to prove conspiracy, "the government must show '[1] that two or more persons agreed to violate the law, [2] that the Defendant knew at least the essential objectives of the conspiracy, ... [3] that the Defendant knowingly and voluntarily became a part of it,' and [4] that the alleged coconspirators were interdependent." *United States v. Evans,* 970 F.2d 663, 668 (10th Cir.1992) (quoting *United States v. Fox,* 902 F.2d 1508, 1514 (10th Cir.), *cert. denied,* 498 U.S. 874, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990)), *cert. denied,* 507 U.S. 922, 113 S.Ct. 1288, 122 L.Ed.2d 680 (1993).

[W]hether the evidence was sufficient to establish a single conspiracy is a question of fact for the jury to decide. To find a single conspiracy, the jury must be convinced beyond a reasonable doubt that the alleged coconspirators possessed a common, illicit goal. Proof of separate transactions does not necessarily establish multiple conspiracies. Rather, it must be determined whether such activities constituted essential and integral steps toward the realization of a common, illicit goal.

*United States v. Peveto,* 881 F.2d 844, 854 (10th Cir.) (citations, internal quotation marks, and footnote omitted), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *see also Roberts,* 14 F.3d at 510–12 ("However diverse and far ranging the activities of each coconspirator may be, so long as there is sufficient proof of mutual dependence and assistance, a single conspiracy exists." (Citations and internal quotation marks omitted.)).

▆▆▆▆ Thus, under *Peveto,* Mr. Owens' and Mr. Johnson's contention amounts to nothing more than a challenge to the sufficiency of the evidence supporting the verdict. In evaluating such challenges,

we review the record *de novo,* and ask only whether, taking the evidence—both direct and circumstantial, together with the reasonable inferences to be drawn therefrom—in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. In order to conclude the evidence was insufficient, as a matter of law, to support a conviction, we must find that no reasonable juror could have reached the disputed verdict.

*Williamson,* 53 F.3d at 1514 (citations and internal quotation marks omitted). In addition, we will not reverse a conviction merely because the verdict was grounded on the uncorroborated testimony of a coconspirator. *United States v. McGuire,* 27 F.3d 457, 462 (10th Cir.1994); *United States v. Sloan,* 65 F.3d 861, 863 (10th Cir.1995) (it is the "general rule" in this Circuit "that in a criminal case a jury may convict a defendant on the *uncorroborated* testimony of an accomplice.") (Emphasis in original.) "To the extent that the evidence conflicts, we accept the jury's resolution of conflicting evidence and its assessment of the credibility of witnesses." *United States v. Sapp,* 53 F.3d 1100, 1103 (10th Cir.1995) (citations and internal quotation marks omitted). Applying this standard, our review of the record shows there was ample evidence from which a reasonable jury could conclude the actions of Nick Owens, Kevin Johnson, and the other three coconspirators tried with them were all part of a single, unified conspiracy to distribute co-

caine in the Musgrave Addition area of Oklahoma City.

Viewed in the light most favorable to the government, the evidence shows that in the early stages, Nick Owens was the organization's supplier. After Ramon Cartznes took over that role in November 1991, Nick Owens helped transport the cocaine from Los Angeles to Oklahoma for distribution through the network his nephews, Morris and Timothy Johnson, had established. William Gaines was responsible for cooking powdered cocaine into a form which could be sold by Timothy and Morris Johnson's distributors, i.e., crack cocaine. William Gaines also helped to prevent the police from interfering with the organization's activities by acting as a lookout. Chiquita Owens helped transport the cocaine from Ramon Cartznes in Los Angeles and Dallas to Timothy Johnson in Oklahoma City for distribution by the various retail sellers he had hired. Finally, Kevin Johnson acted as an intermediary between Ramon Cartznes, the organization's supplier from November 1991 to February 1994, and his half-brother Timothy Johnson, the leader of the organization's activities in Oklahoma City from November 1991 to February 1994. Thus, although each had a different role and their roles changed during the six years the organization existed, each served as a vital part of the overall conspiracy, either as suppliers, drug manufacturers, couriers, or lookouts. *See Roberts,* 14 F.3d at 511 (" '[L]apses of time, changes in membership, or shifting emphases in the locale of operations [do not] necessarily convert a single conspiracy into multiple conspiracies.' " (Quoting *United States v. Maldonado–Rivera,* 922 F.2d 934, 963 (2d Cir.1990), *cert. denied,* 501 U.S. 1233, 111 S.Ct. 2858, 115 L.Ed.2d 1025 (1991)); *United States v. Gomberg,* 715 F.2d 843, 846 (3d Cir.1983) ("A division of labor among conspirators in pursuit of a common goal does not necessitate a finding of discrete schemes."), *cert. denied,* 465 U.S. 1078, 104 S.Ct. 1439, 79 L.Ed.2d 760 (1984); *United States v. Gonzalez,* 940 F.2d 1413, 1422 (11th Cir.1991) (there may be a single conspiracy even if one or more members of the conspiracy dominates, provided that the lesser players also work toward the common goal), *cert. denied,* 502 U.S. 1047 and 1103, 112 S.Ct. 910

and 1194, 116 L.Ed.2d 810 and 117 L.Ed.2d 435 (1992). Our conclusion is reinforced by the fact that four of the five individuals tried together were members of the same family. *See United States v. Askew,* 958 F.2d 806, 810 (8th Cir.1992) (verdict finding that there was a single conspiracy supported by evidence that the "drug ring was a family affair, in which family members had various roles but were aware of the common goal").

C. Sufficiency of the Evidence Supporting Nick Owens' Conviction for Being a Felon in Possession of a Firearm

■ Nick Owens contends there was insufficient evidence to support his conviction for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g). According to Mr. Owens, *no reasonable jury could have found he was in constructive possession of the handgun absent specific evidence there was a nexus between himself and the weapon, because he shared his home with at least one other person. See United States v. Mills,* 29 F.3d 545, 549–550 (10th Cir.1994). We disagree. Mr. Owens was arrested in his bedroom while he was lying asleep in his bed. There was a semiautomatic handgun under the bed. There is no indication he shared his bedroom with anyone else. Thus *Mills* and our other decisions addressing constructive possession in cases of "joint occupancy" are distinguishable.

II. Sentencing Issues

A. Nick Owens

■ Mr. Owens challenges the district court's finding he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive" within the meaning of U.S.S.G. § 3B1.1(a). We review the district court's finding only for clear error, " 'giv[ing] due deference to the district court's application of the guidelines to the facts.' " *United States v. Torres,* 53 F.3d 1129, 1142 (10th Cir.1995) (quoting 18 U.S.C. § 3742(e)), *cert. denied,* — U.S. ——, 115 S.Ct. 2599, 132 L.Ed.2d 845 and — U.S. ——, 116 S.Ct. 220, 133 L.Ed.2d 150 (1995). To determine whether a defendant was an organizer or

leader, the district court should consider, among other things,

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. § 3B1.1, comment. (n. 4); *Torres,* 53 F.3d at 1142.

Paragraph 38 of Mr. Owens' presentence report stated only that "Pursuant to U.S.S.G. § 3B1.1(a), the offense is increased four levels. The defendant is considered a leader in reference to his role in the conspiracy. He supplied large quantities of cocaine to others and claimed a larger share of the profits." Mr. Owens filed a written objection to paragraph 38. It stated:

> Defendant objects to paragraph 38 of the Presentence Report. In paragraph 38, Defendant's base offense level is increased by 4 points on the ground that the Defendant was a leader in the alleged conspiracy. Paragraph 38 states that the Defendant supplied large quantities of cocaine to others and claimed a larger share of the profits. Defendant[ ] objects to this 4 point increase. There is no evidence in any of the information provided to Defendant's counsel prior to trial nor any testimony during trial that would support the conclusion that this Defendant claimed 'a larger share of the profits.'
>
> In addition, Defendant objects to the conclusion that he was a leader in the conspiracy because he allegedly supplied large quantities of drugs to other individuals. Presumably, the quantity of drugs this Defendant allegedly supplied was considered in determining the base offense level and it is therefore improper to add additional points for the same quantity of drugs.
>
> Lastly, there is no evidence that the Defendant exercised any decision making authority or exercised any authority or control over anyone else. In fact, testimony at trial is quite to the contrary when individuals such as Charles Watson and Ramon Cartznes testified that they did not share profits with this Defendant and did not consult with or seek his permission before engaging in any drug related activity.

At Mr. Owens' sentencing hearing, the district court stated:

> Your objection to paragraph 38 is to the four-level adjustment for the role in the offense. I understand this objection and I have considered it carefully. I believe that the evidence is overwhelming that Mr. Owens was the leader of this conspiracy, the one who obtained the drugs and directed the activities of others and gained profit from 1988 until late 1991. Mr. Owens continued as a part of the conspiracy and was beginning again ... to assume a leadership role toward the end. Although he perhaps did not lead and organize an extensive conspiracy for the entire six years, he did for at least three [years].

On appeal, Mr. Owens essentially concedes, and we agree, the trial evidence shows he supplied cocaine to his nephews Morris and Timothy Johnson on credit from late 1987 to November 1991; Morris and Timothy Johnson redistributed the cocaine to other "retail" dealers for resale in the Musgrave Addition area of Oklahoma City; and Nick Owens derived significant profits from the transactions. He contends, however, the mere fact he supplied drugs is not enough to support the district court's finding he was an organizer or supplier.

During oral argument, Mr. Owens' counsel compared Mr. Owens' relationship to his nephews to the relationship between Pillsbury and a local bakery. He contended, and we agree, Pillsbury could not be considered the "organizer or leader" of a local bakery merely because it supplied flour on credit and derived significant profits from the business relationship. There are two minor flaws in this analogy. First, when a company supplies flour, it has little interest in what happens to the flour thereafter provided it receives timely payment. However, when an individual supplies cocaine for redistribution to the public, he has a very great interest in

what happens to it beyond his interest in payment. For example, the supplier will be concerned about who the distributors and retail customers are. If they are police or police informants, the supplier could be implicated, tried, and sent to prison, just like Mr. Owens. Second, it is reasonable to infer the business relationship between Nick Owens and his nephews was not the type of arms-length contractual arrangement Pillsbury would likely have with a local bakery. Nick Owens is twenty-three years older than Timothy Johnson and twenty years older than Morris Johnson, and they are all related by blood. In late 1987, when Nick Owens began supplying cocaine to his nephews, he was forty years old, Timothy Johnson was seventeen, and Morris Johnson was twenty.

▮▮▮▮ Nevertheless, we accept Mr. Owens' analogy and agree the mere fact he supplied cocaine to his nephews, without something more, is not enough to support the district court's finding he was an organizer or leader. *See Torres,* 53 F.3d at 1143 ("Because we believe the evidence in the record does not demonstrate how the [defendant's] relationship with the other participants amounted to something more than a wholesaler/retailer or buyer/seller relationship, we hold the government failed to carry its burden of showing that a § 3B1.1(a) enhancement was proper."). Nor is it sufficient that Mr. Owens' role as a supplier may have made him "an important figure who was integral to the success of [the] conspiracy." *Id.* "[T]he gravamen of this enhancement is control, organization, and responsibility for the actions of other individuals, because § 3B1.1(a) is an enhancement for organizers or leaders, not for important or essential figures." *Id.* at 1142 (citations and internal quotation marks omitted).

The government cites several parts of the trial transcript it believes directly show Mr. Owens controlled both his nephews and the other members of the conspiracy between late 1987 and November 1991, and he was "reasserting" himself before the conspiracy ended. Virtually all of the cited portions of the record show only Nick Owens supplied cocaine to his nephews on credit and derived profit from the transactions, which, as we have already explained, is not enough. The cited portions also show Nick Owens helped William Gaines teach Morris and Timothy Johnson to cook cocaine powder, Timothy Johnson talked to Nick Owens in order to "take care of" a customer's complaint about the quality of the cocaine he had supplied, Nick Owens personally delivered cocaine to Morris and Timothy Johnson at 701 83rd Street, the organization's base of operations, Timothy Johnson told Ramon Cartznes Nick Owens "used to have a lot of money and used to sell dope in Oklahoma" and he had made trips to pick up cocaine before. Ramon Cartznes never actually saw Nick Owens get paid for one of the trips he took to California to pick up cocaine, although it was Ramon Cartznes' understanding Nick Owens would indeed be paid, Nick Owens purchased nine ounces of cocaine from Ramon Cartznes for himself, not for Timothy Johnson, Nick Owens used his own car to pick up cocaine from Mr. Cartznes, and Ramon Cartznes cooked cocaine at Nick Owens' house at least once. At most, this evidence shows Nick Owens was deeply involved in the conspiracy, first as a supplier and later as a courier; it does not show he led or organized the conspiracy. Furthermore, contrary to the government's assertion, none of this evidence shows Nick Owens recruited or even encouraged his nephews to sell cocaine for him.

The record also does not contain evidence tending to show any of the other recognized indicia of leadership and control. For example, there is no evidence that Mr. Owens restricted the people to whom his nephews could sell drugs or whom they could hire to distribute drugs to their retail customers, he controlled the place of wholesale or retail delivery, or he set retail prices. *See Torres,* 53 F.3d at 1143. Furthermore, the record shows Nick Owens did not receive a larger share of the profits than his nephews Morris and Timothy Johnson, but they split the proceeds equally. Morris Johnson testified he retailed crack cocaine for approximately $500 per quarter ounce, and he kept $250 for himself and paid Nick Owens $250. We therefore conclude the district court's finding was clearly erroneous.

B. Kevin Johnson

1. Quantity of Drugs

■■■■ Kevin Johnson contends the district court's finding 6.995 kilograms of cocaine base attributable to him was erroneous. "The drug amount attributable to a defendant for purposes of sentencing is not established merely by looking to the amount of drugs involved in the conspiracy as a whole," but only to "the quantity of drugs which he reasonably foresaw or which fell within 'the scope' of his particular agreement with the conspirators." *Roberts*, 14 F.3d at 522 (quoting *United States v. Castaneda*, 9 F.3d 761, 769–770 (9th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1564, 128 L.Ed.2d 210 (1994)); *see also Torres*, 53 F.3d at 1144 ("The touchstone . . . is whether the quantities were reasonably foreseeable to the coconspirators in light of the nature, extent, and purpose of the conspiracy."); *United States v. Ortiz*, 993 F.2d 204, 207 (10th Cir.1993); U.S.S.G. § 1B1.3, comment. (n. 2). We review the district court's finding for clear error, and we will reverse only if we are "convinced that the sentencing court's finding is simply not plausible or permissible in light of the entire record on appeal." *Torres*, 53 F.3d at 1144. Furthermore, "[t]he credibility of a witness whose testimony is relied upon at sentencing is for the sentencing court to analyze." *Sloan*, 65 F.3d at 865 (citing *United States v. Deninno*, 29 F.3d 572, 578 (10th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1117, 130 L.Ed.2d 1081 (1995)).

■■■ The government notes under U.S.S.G. § 2D1.1, as amended November 1, 1994, Kevin Johnson's base offense level would be the same (38) provided at least 1.5 kilograms of cocaine base were attributable to him. It also notes the district court sentenced Mr. Johnson to the minimum term permitted in that guideline range, 292 months in criminal history category I. Thus, according to the government, even if the district court's finding was clear error, the error was harmless provided at least 1.5 kilograms of cocaine base were attributable to Kevin Johnson. As a threshold matter, we must determine whether the government was correct to base its harmless error argument on the version of U.S.S.G. § 2D1.1 in

effect on November 1, 1994. We ordinarily apply the version of the sentencing guidelines in effect at the time of sentencing, which in this case occurred on November 1, 1994, the effective date of the amendment. 18 U.S.C. § 3553(a)(4); U.S.S.G. § 1B1.11(a); *United States v. Gerber*, 24 F.3d 93, 95 (10th Cir.1994). However, we apply the version in effect at the time the offense occurred if application of the version in effect at the time of sentencing would violate the Ex Post Facto Clause. U.S. Const., art. I, § 9, cl. 3; *see* U.S.S.G. § 1B1.11(b)(1); *United States v. Nelson*, 36 F.3d 1001, 1003 (10th Cir.1994). To determine whether the Ex Post Facto Clause would be violated, we compare the effect that application of the version in effect at the time of sentencing and the version in effect at the time of the offense would have on the defendant's sentence; if application of the former would place the defendant at a disadvantage, we must apply the latter. *United States v. Massey*, 48 F.3d 1560, 1567–568 (10th Cir.), *cert. denied,* —— U.S. ——, 115 S.Ct. 2628, 132 L.Ed.2d 868 (1995); *Nelson*, 36 F.3d at 1003. The version of U.S.S.G. § 2D1.1 in effect at the time of Kevin Johnson's last offense provided the base offense level was 38 if "[a]t least 1.5 KG but less than 5 KG of Cocaine Base" were attributable to the defendant. Thus, under both the version of U.S.S.G. § 2D1.1 in effect at the time of the offense and the version in effect at the time of sentencing, Kevin Johnson's offense level would be the same provided at least 1.5 kilograms are attributable to him. Accordingly, the government was correct to base its argument on the amended version of U.S.S.G. § 2D1.1.

The government has identified the following trial evidence to support its assertion that at least 1.5 kilograms of cocaine base were attributable to Kevin Johnson: Kevin Johnson (1) arranged a one-half kilogram shipment of cocaine from Mr. Cartznes to Timothy Johnson three weeks after introducing them; (2) received a one-half kilogram UPS shipment from Mr. Cartznes stolen by Robert Malone; (3) obtained one-half kilogram of crack cocaine from Mr. Cartznes and gave it to Charles Watson and others to transport to Oklahoma in a rented car; (4)

supplied one-half kilogram of cocaine powder to Ronnie Johnson and Devin Price for shipment to Oklahoma. This totals no more than 2 kilograms of cocaine, however, of which at least one-half kilogram was cocaine powder.

The government also points out Kevin Johnson was an intermediary between Ramon Cartznes and Timothy Johnson between November 1991 and February 1994 and Mr. Cartznes supplied (1) ten shipments of between five ounces and one-half kilogram of cocaine by UPS, (2) one-half kilogram Chiquita Owens body packed and transported on a commercial airline in January 1993, (3) thirteen ounces Chiquita Owens and Charles Watson transported from Dallas to Oklahoma City, and (4) three shipments of one-half to one kilogram Chiquita Owens transported by car. It also contends we can infer a significant part of this was cocaine base rather than cocaine powder because the organization sold only cocaine base to its retail customers, and even if it was cocaine powder, Kevin Johnson could have foreseen it would be cooked into cocaine base. On the basis of the evidence, the government contends we can reasonably estimate at least 1.5 kilograms of cocaine base were attributable to Kevin Johnson.

Courts may rely on government estimates to approximate the quantity of drugs attributable to a defendant, provided there are " 'sufficient indicia of reliability to support [the estimate's] probable accuracy.' " *Ortiz*, 993 F.2d at 207 (quoting U.S.S.G. § 6A1.3(a)); *see also United States v. Hooks*, 65 F.3d 850 (10th Cir.1995). Combining the estimated amounts of cocaine attributable to Kevin Johnson with the specific amounts of cocaine the record shows he actually handled or dealt with directly, we agree at least 1.5 kilograms of cocaine base were attributable to him and, if the district court's finding was clearly erroneous, the error was harmless as a matter of law.

### 2. Obstruction of Justice

■ Mr. Johnson also contends the district court erred by increasing his offense level two points for obstruction of justice because he perjured himself at trial. U.S.S.G. § 3C1.1; *United States v. Dunnigan*, 507 U.S. 87, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993); *Massey*, 48 F.3d at 1573–74. Paragraph 31 of Mr. Johnson's presentence report recommended the upward adjustment because

> [a]t trial and during the presentence interview, [Mr. Johnson] asserted that he did not participate in illegal drug trafficking activities. He acknowledged that he introduced Timothy Johnson and Ramon Cartznes, but explained that it was not for the purpose of furthering any illegal activity. He denied knowledge of any cocaine transactions. He was convicted by a jury of all counts in the indictment. It appears that [Mr. Johnson] has obstructed justice by lying at trial, which triggers the 2–point enhancement provision pursuant to U.S.S.G. § 3C1.1.

Mr. Johnson filed a written objection to paragraph 31 stating: "The only evidence at trial was testimony from persons that were trying to lessen the impact of their involvement. The jury convicted [Mr. Johnson] based on that testimony. That does not mean [Mr. Johnson] was lying. He should not be assessed the 2–point enhancement." In response to the written objection, the district court stated during the sentencing hearing:

> It is now clear through the case law that a defendant who is found to have lied at trial is subject to the increase for obstruction of justice. Mr. Kevin Johnson denied his participation, denied several facts. In the course of denying that participation, I find that he did lie, that the evidence is overwhelming against him, and that the obstruction of justice enhancement is justified.

■ According to Mr. Johnson, the district court failed to make adequate findings in response to his objection to paragraph 31.

> [I]f a defendant objects to a sentence enhancement resulting from [his] trial testimony, a district court must review the evidence and make independent findings necessary to establish a willful impediment to or obstruction of justice, or an attempt to do the same. . . . When doing so, it is preferable for a district court to address each element of the alleged perjury in a

separate and clear finding. The district court's determination that enhancement is required is sufficient, however, if ... the court makes a finding of an obstruction or impediment of justice that encompasses all of the factual predicates for a finding of perjury.

*Dunnigan,* 507 U.S. at 95, 113 S.Ct. at 1117. A defendant commits perjury if he gives false testimony under oath concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake or faulty memory. *Id.* at 93–94, 113 S.Ct. at 1116.

Although *Dunnigan* does not require the sentencing court identify the specific statement it believes to be false, "it has long been a requirement in the Tenth Circuit that the perjurious statement be identified" in the district court's findings. *Massey,* 48 F.3d at 1573 & n. 12. Without such a finding, "we are left wholly unable to satisfy our appellate responsibility of review in determining whether the record would support findings of falsity, materiality, and willful intent." *Id.* at 1574. Furthermore, unless the sentencing court adequately identifies the perjurious statement, it is impossible for the defendant to respond effectively to the government's assertion he perjured himself at trial. We recognize, however, highly specific findings may not be possible in every case because the district court often does not have access to a copy of the trial transcript during sentencing. Therefore, we do not require the sentencing court "recite the perjurious testimony verbatim." *Id.* Rather,

> [t]he district court may generally identify the testimony at issue from his or her trial notes or memory and it is sufficient if such testimony is merely described in substance so that when we review the transcript we can evaluate the *Dunnigan* findings of the elements of perjury against an identified line of questions and answers without having simply to speculate on what the district court might have believed was the perjurious testimony.

*Id.*

The district court's finding in this case did not adequately identify the specific statements it believed were false. It found only

"Mr. Kevin Johnson denied his participation, denied several facts." We have held a finding a defendant falsely denied "involvement" in the charged offense is inadequate, *United States v. Yost,* 24 F.3d 99, 106 (10th Cir. 1994), and we see no principled distinction between a denial of "involvement" and a denial of "participation." Indeed, a denial of "involvement" or "participation" may be nothing more than a general denial of guilt, which is not a proper basis for an adjustment for obstruction of justice. *See United States v. Hansen,* 964 F.2d 1017, 1020 (10th Cir. 1992). In addition, the district court's finding Kevin Johnson lied about "several facts" is patently inadequate because it conveys absolutely no information whatsoever about *which* facts the district court believed he misstated. We therefore remand the case for further findings regarding the adjustment in Mr. Johnson's offense level for obstruction of justice.

### III. Conclusion

Nick Owens' and Kevin Johnson's convictions are **AFFIRMED.** These cases are **REMANDED** for resentencing in accordance with this opinion.