UNITED STATES COURT OF APPEALS

**Filed 7/10/96**

---

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

    v.

SUSAN JEANNE BOWMAN,

    Defendant-Appellant.

No. 95-5203
(D.C. No. 95-CR-19-C)
(N.D. Okla.)

---

ORDER AND JUDGMENT[*]

---

Before KELLY, BRISCOE, and LUCERO, Circuit Judges.

---

Susan Bowman was charged by indictment and convicted of nine counts of wire fraud, in violation of 18 U.S.C. § 1343, and aiding and abetting, in violation of 18 U.S.C. § 2. The district court sentenced her to 27 months of imprisonment on each count, all counts to run concurrently. On appeal, she alleges (1) the evidence is insufficient to support her conviction and, alternatively, (2) her sentence is incorrect because the district court erred by finding she targeted vulnerable victims and was a minor, instead of a

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

minimal, participant in the fraudulent scheme. We affirm her convictions and remand for resentencing after concluding the district court erred in adding two levels to Susan Bowman's offense level for targeting vulnerable victims.

I.

Susan Bowman and her husband Robert Bowman were charged with devising and executing a scheme to obtain money by fraud and by use of interstate wire and telephone communications. The record reflects that, as part of their scheme, Robert formed Insurance Dynamics of America (IDA) with the stated purpose of selling insurance products, primarily annuity contracts. Lured by the promise of higher than market returns, investors were persuaded to invest sums totaling over $500,000. The investors periodically received account statements detailing the interest they supposedly had earned on their investments, discussing projects in which IDA supposedly was involved, and identifying companies in which IDA supposedly had an ownership interest. By the time the Federal Bureau of Investigation examined IDA's records, there was no money left in its bank accounts. The investors never received repayment of their principal and, with the exception of Nellie Brandt and possibly one other investor, none of the investors received even a partial interest payment.

Susan worked in the office and had authority with respect to IDA's finances. She managed IDA's day-to-day operations in Robert's absence. Using purchased prospect lists and newspaper advertisements, Robert recruited elderly persons of varying levels of

2

sophistication to invest in IDA. Robert sold them debentures with returns varying from 11 to 12.5 percent, payable in three years, with the proceeds intended to capitalize IDA. Robert signed the debentures as president and Susan signed as corporate secretary. Susan directly participated in efforts to obtain money from Myrtle Moody and William and Agnes Warren. She solicited Moody's initial investment, attended a follow-up sales meeting with Moody at which Robert was present, and participated in at least one sales meeting at which Robert misrepresented the manner in which the Warrens' investment would be used--he told them it would be used to purchase certificates of deposit when in fact a substantial amount of these monies were diverted by the Bowmans for their personal use. Thus, the evidence indicates Susan's responsibilities straddled management and sales, although she was primarily a manager.

The evidence indicates the Bowmans used up to 54 percent of the investors' money for expenses unrelated to IDA. For example, money was wired from IDA accounts to the Bowmans' daughter and to Robert's parents; checks were written on IDA accounts to the Bowmans' children and for college tuition, personal items, other business ventures, and residential rent; and much of the investors' money was used to purchase cashier's checks or was withdrawn by checks written to "cash." Susan signed most of the checks written on IDA accounts.

II.

Susan argues the evidence is insufficient to establish she committed wire fraud or

knowingly and intentionally associated herself with Robert's scheme to defraud the investors. The standard of review applicable to a sufficiency of evidence challenge is highly deferential to the prosecution; indeed, we have stated that an appellant challenging his conviction due to insufficiency of the evidence must overcome a "difficult standard" of review. United States v. Hoenscheidt, 7 F.3d 1528, 1530 (10th Cir. 1993). We recently explained the standard:

> In evaluating a challenge to the sufficiency of the evidence, "we review the record *de novo*, and ask only whether, taking the evidence--both direct and circumstantial, together with the reasonable inferences to be drawn therefrom--in the light most favorable to the government, a reasonable jury could find the defendant guilty beyond a reasonable doubt. In order to conclude the evidence was insufficient, as a matter of law, to support a conviction, we must find that no reasonable juror could have reached the disputed verdict."

United States v. Hicks, 84 F.3d 1244, 1253 (10th Cir. 1996) (quoting United States v. Owens, 70 F.3d 1118, 1126 (10th Cir. 1995)).

A person commits wire fraud if, "having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, [he] transmits or causes to be transmitted by means of wire [or] radio . . . communication in interstate . . . commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice." 28 U.S.C. § 1343. Thus, the essential elements of wire fraud are a scheme to defraud and use of interstate wire communications to facilitate the scheme. United States v. Galbraith, 20 F.3d 1054, 1056 (10th Cir.), cert. denied 115 S. Ct. 233 (1994). "[A]

4

scheme to defraud is conduct intended or reasonably calculated to deceive persons of ordinary prudence or comprehension." United States v. Hanson, 41 F.3d 580, 583 (10th Cir. 1994).

On the other hand, to be liable as an aider and abettor under 18 U.S.C. § 2, the evidence must establish defendant associated himself with a criminal venture, defendant participated in the venture as something he wished to bring about, defendant sought by his actions to make the venture succeed, and proof established commission of the offense by someone and aiding and abetting by defendant. Hanson, 41 F.3d at 582.

Susan concedes Robert "formed and executed" a fraudulent scheme, and we recently affirmed his convictions for wire fraud, United States v. Bowman, 1996 WL 308725 (10th Cir. June 10, 1996). In their briefs, the parties seem to focus on Susan's liability as an aider or abettor. The critical issue is whether she knew of the fraudulent scheme and voluntarily associated herself with it in an attempt to make it succeed. She asserts she was nothing more than an office employee and contends the government's case rests solely on her marital relationship with Robert.

Susan argues the evidence of her involvement makes her indistinguishable from the defendant in Hanson, whose convictions for aiding and abetting wire fraud were reversed. In Hanson, the owner of a financial services firm gave a broker a percentage of the firm to locate individuals willing to provide capital for expansion. The broker procured the capital by fraud. The government charged the owner with, among other

5

things, wire fraud and aiding and abetting. This court reversed defendant's aiding and abetting convictions, explaining:

> A defendant may not stumble into aiding and abetting liability by inadvertently helping another in a criminal scheme unknown to the defendant; rather, a defendant must "willfully associate [herself] with the criminal venture and seek to make it succeed through some action on [her] part." United States v. DeLuna, 10 F.3d 1529, 1533-34 (10th Cir. 1993) (quoting United States v. Esparsen, 930 F.2d 1461, 1470 (10th Cir. 1991), cert. denied [502 U.S. 1036] (1992)).
>
> Here, no evidence indicates that Ms. Hanson knew what Mr. Nelson was about or intended to aid and abet Nelson in a scheme to defraud investors. While it is true that Ms. Hanson's finances were not necessarily in sterling condition at the time of her association with Nelson, more than a suggested motive is necessary for a finding of guilt. While Ms. Hanson willfully associated herself with Nelson by hiring him, no evidence has been adduced to prove that she knew of any fraudulent scheme on his part or that she intended to help him in the execution of such a scheme. Nor is there any evidence that Ms. Hanson knowingly sought by her actions to aid and abet any fraud perpetrated by Nelson against HFS investors. Based on the evidence proffered at trial, no rational trier of fact could have found the Defendant guilty of aiding and abetting beyond a reasonable doubt.

41 F. 3d at 582-83.

Susan's reliance on Hanson is misplaced. As in Hanson, the government here attempted to prove one person (Robert), with the knowledge and voluntary participation of a second person (Susan), fraudulently lured investors to provide capital, most of which was diverted to unrelated expenses. However, unlike Hanson, there is evidence Susan knew what Robert "was about" and in fact that she knowingly aided him in the execution of his scheme. By participating in the recruitment and solicitation of investors and the misdirection and misapplication of investors' funds, Susan associated herself with Robert's scheme, participated in it as something she wished to bring about, and sought by

6

her actions to make it succeed.

The record belies Susan's portrayal of herself as an average IDA employee. Like Robert, she participated in every aspect of the scheme, although she was less involved in recruiting investors and in soliciting investments. She attended several sales meetings; she solicited Moody by telephone and visited her in Oklahoma City; she met with Agnes Warren in IDA's Tulsa office and apparently at the Warren home and wrote to Agnes about soliciting other nurses; she signed IDA debentures as corporate secretary even after she no longer held the position; and she had multiple conversations with various investors when they telephoned to speak to Robert. Additionally, Susan exercised control over IDA's finances by signing checks, most of which were applied to expenses unrelated to IDA, and IDA's finances were totally depleted by the time an investigation was conducted. She shared in the enjoyment of the fraudulently obtained funds.

In short, we are persuaded that the record provides sufficient bases from which a reasonable jury could infer Susan willfully associated herself with the criminal venture and sought to make it succeed through some action on her part. More specifically, we conclude that, when viewed in the light most favorable to the government, the evidence is such that a rational finder of fact could have found her guilty of aiding and abetting beyond a reasonable doubt.

### III.

Susan argues we should remand for resentencing because the district court erred by

finding she targeted vulnerable victims and she was a minor, instead of a minimal, participant in the scheme. We review a sentencing court's factual determinations for clear error and its application and interpretation of the sentencing guidelines de novo. United States v. Voss, 82 F.3d 1521, 1531 (10th Cir. 1996). As Susan challenged factual determinations, we review only for clear error.

The district court added two levels to Susan's base offense level pursuant to U.S.S.G. § 3A1.1, which requires that the court increase a defendant's offense level two levels "if the defendant knew or should have known that a victim of the offense was unusually vulnerable due to age, physical or mental condition, or that a victim was otherwise particularly susceptible to the criminal conduct." Application note 2 to § 3A1.1 states this adjustment "applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability." In order to classify a victim as unusually vulnerable, "the sentencing court [must] make particularized findings of vulnerability." United States v. Lee, 973 F.2d 832, 834 (10th Cir. 1992).

Susan concedes the investors were vulnerable, but denies she targeted victims because of their unusual vulnerability. More specifically, she argues there is no evidence she selected the persons who were solicited to purchase debentures. In response, the government argues the evidence supports the court's finding because it demonstrates she knew IDA targeted elderly investors because some investors visited IDA offices and

spoke to Susan on the telephone. Additionally, as an office manager, she must have learned IDA was purchasing prospect lists focusing on elderly persons and she should have known elderly persons would have been particularly interested in higher rates of return.

The district court adopted the findings of fact contained in the presentence investigation report. At the sentencing hearing, the court elaborated somewhat on the findings, finding there was "a strong nexus between the vulnerability of these people and the scheme itself," and explaining that although Robert "probably was the one who knew more than anyone as to the [investors'] vulnerability," given the duration of the scheme, the time elapsed between solicitations, and Susan's knowledge of and control over IDA finances and accounts, she "was fully knowledgeable about the scheme and what was going on and where the monies were coming from." Append. IX at 9-10. The court also stated generally that Susan "knew what was going on and played the necessary part in the solicitation, and in the ongoing efforts to get this money." Id. at 10.

After reviewing the record on appeal, we are persuaded there is insufficient evidence to support a finding that Susan targeted vulnerable victims. The court's finding imputes a level of knowledge to Susan that is inadequately supported by the record. Her role in the scheme does not suggest a knowledge or awareness that the victims were vulnerable or that she should have known Robert targeted unusually vulnerable victims. The evidence regarding her involvement in telemarketing is limited and too general to

9

allow one to infer she knew or should have known unusually vulnerable victims were being targeted. Although she personally solicited Moody and was present during some of the meetings of Robert with Moody and the Warrens, there is no evidence that Susan contacted Moody or any other investor to exploit their unusual vulnerability.

We are unpersuaded by the government's argument that several office visits and frequent telephone calls by elderly investors are sufficient to establish Susan knew or should have known that IDA targeted unusually vulnerable victims. Cf. Lee, 973 F.2d at 834 (membership in class of elderly persons cannot alone support a § 3A1.1 enhancement; victim must be "unusually vulnerable" due to age and there must be a nexus between vulnerability and crime's ultimate success); United States v. Smith, 30 F.2d 1450, 1455 (10th Cir.) ("The label 'elderly' . . . is too vague, standing alone, to provide the basis for a finding of unusual vulnerability."), cert. denied 502 U.S. 879 (1991). Further, the government's argument that a higher rate of return alone satisfied § 3A1.1 is specious. We are mindful of United States v. Lowder, 5 F.3d 467, 472 (10th Cir. 1993), where this court upheld an enhancement under § 3A1.1 based on a finding that the victims were elderly unsophisticated retirees who were fraudulently induced to invest their retirement funds in a phony investment scam; however, we believe this case is factually distinguishable. We conclude the district court erred in finding that Susan targeted vulnerable victims.

Susan also argues the court erred in finding she was a minor participant instead of

10

a minimal participant as she requested in her written objections to the presentence investigation report.

In <u>United States v. Ayers</u>, 84 F. 3d 382, 383-841 (10th Cir. 1996), we recently explained:

> Section 3B1.2 "vests the district court with discretion to grant a base offense level reduction if it finds a defendant is less culpable relative to other participants in a given offense." [<u>United States v. Santistevan</u>, 39 F.3d 250, 254 (10th Cir. 1994)]. Subsection 3B1.2(a) authorizes a four-level reduction if the defendant was a "minimal participant" in the crime. Subsection 3B1.2(b) authorizes a two-level reduction for a "minor participant" in the crime. The commentary to 3B1.2 explains that minimal participants are "defendants who are plainly among the least culpable of those involved in the conduct of a group." USSG 3B.2 comment, n.1. "[T]he defendant's lack of knowledge or understanding of the scope and structure of the enterprise and of the activities of others is indicative of a role as minimal participant." <u>Id.</u>
>
> The commentary also lists several examples of minimal participants: "someone who played no other role in a very large drug smuggling operation than to offload part of a single marihuana shipment, or in a case where an individual was recruited as a courier for a single smuggling transaction involving a small amount of drugs." USSG 3B1.2 comment, n.2. A downward adjustment for minimal participants should be made infrequently. <u>Id.</u>

Our review of the record indicates Susan initiated IDA's solicitation of one investor, participated in the ongoing solicitation of that investor, was present during at least one sales meeting where Robert misrepresented the manner in which he would use the investors' money, signed all debentures, signed most checks drawn on IDA accounts, and personally benefited from misapplied funds. The evidence does not suggest that Susan was a mere minimal participant in the scheme.

11

IV.

We AFFIRM Susan Bowman's convictions and REMAND to the district court for resentencing.

Entered for the Court

Mary Beck Briscoe
Circuit Judge